# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| RYTIS TERESKO and EDITA TERESKO, | |
| Plaintiffs, | Case No. 22-CV-1532-JPS |
| v. | |
| LIBERTY MUTUAL INSURANCE COMPANY and BLUE CROSS BLUE SHIELD OF ILLINOIS, | **ORDER** |
| Involuntary Plaintiffs, | |
| v. | |
| THE 3M COMPANY and ABC INSURANCE COMPANY, | |
| Defendants. | |

Plaintiffs Rytis Teresko ("Teresko") and Teresko's former wife, Edita Teresko ("Ms. Teresko"), sue Defendants The 3M Company ("3M") and ABC Insurance Company for negligence, strict liability, and loss of consortium (as to Ms. Teresko),[1] after Teresko fell 80–100 feet while performing maintenance work on a cell tower in Milwaukee. ECF Nos. 11, 46-6. At this juncture, Teresko has stipulated to the dismissal of his manufacturing and instructional defect strict liability claims. ECF No. 46-6 at 2 n.3, 21. The Court will adopt that stipulation and, because it does not

---

[1] Ms. Teresko appears to bring only the loss of consortium claim; accordingly, the bulk of the Court's references to plaintiff-side arguments in this Order are to only Teresko. Where appropriate, references to Teresko and Ms. Teresko together will be to "Plaintiffs."

state otherwise, dismiss the manufacturing and instructional defect strict liability claims without prejudice. Fed. R. Civ. P. 41(a)(1)(B) ("Unless the notice or stipulation states otherwise, the dismissal is without prejudice.").

Teresko therefore proceeds only on design defect strict liability and negligence claims related to 3M's design of the DBI-SALA Lad-Saf X3 cable sleeve (the "X3"), which is used to assist in climbing cell towers, and Ms. Teresko proceeds on her loss of consortium claim. ECF No. 46-6 at 1. 3M moves for summary judgment on all three claims. ECF No. 35.[2] For the reasons set forth below, the motion will be denied, and this case will proceed to trial on December 18, 2023 as scheduled. ECF No. 28.

1.  **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant.

---

[2]Plaintiffs moved to strike 3M's motion for summary judgment for failure to comply with the Court's pretrial order. ECF No. 42. Plaintiffs were concerned that 3M would not fully abide by the parties' agreement to file their stipulated statement of undisputed facts by September 18, 2023 and that 3M had cited facts outside that statement in its briefing. *Id.* The Court adheres to its pretrial order by the letter and disregards any facts introduced in the parties' briefing that are not set forth in the statements of undisputed or disputed facts. *See Kreuziger v. Milwaukee County*, 617 F. Supp. 3d 970, 974 (E.D. Wis. 2022), *aff'd*, 60 F.4th 391 (7th Cir. 2023). For that reason, the Court declined to act on the motion to strike pending the execution of the parties' agreement as to timing. Because the stipulated statement of undisputed facts was filed as the parties agreed, ECF No. 46-6, the Court will now deny the motion to strike as moot.

*Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015)). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255 and *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 505 (7th Cir. 2010)).

## 2. RELEVANT FACTS[3]

Teresko worked as a cell tower repairman. On February 8, 2020, he was performing maintenance work on a tower in Milwaukee when he fell approximately 80–100 feet. Teresko has no memory from a time just prior to the fall until sometime afterward.

At the time of his fall, Teresko was using an X3, which is intended to lock onto a steel cable that runs vertically and parallel to cell towers and is used to assist in climbing them. Properly installed and used, the X3 arrests its user's descent in the event of a fall. It is undisputed that the X3 was connected to the cell tower cable and that it did not arrest Teresko's fall. Teresko suffered severe injuries from the fall. It is undisputed that the cable in question was consistent with those approved for use with the X3. Teresko

---

[3]The parties submitted a stipulated statement of undisputed facts. ECF No. 46-6. In large part, the stipulated statement of "undisputed facts" is a summary of Plaintiffs' and 3M's respective experts' reports and how each expert plans to rebut the other's opinions. The same is true as to Plaintiffs' and 3M's respective statements of disputed facts, which attack the testing methodologies and supporting facts relied upon by each other's experts, ECF No. 37, or defend the same, ECF No. 46-7. This alone should make it wholly clear that summary judgment is inappropriate in this case. For purposes of 3M's motion for summary judgment, the Court will adopt those *relevant* stipulated facts that are actually facts (with brief references to the expert report summaries for context), with minor edits and internal citations omitted for brevity.

alleges that the X3 was defective and unreasonably dangerous and that 3M was negligent in its design; 3M denies those allegations.

The X3 connects a user to a steel cable used to ascend to and descend from an elevated area. The cable system is supported by brackets at the top and bottom of the structure. In the event of a fall, the X3 is intended to lock onto the cable and arrest the user's fall:



3M intended to design the X3 such that it would conform to the American National Standards Institute ("ANSI") Z359.16, a voluntary industry standard that is intended to certify the safety of vertical cable systems. The "locking function" test is detailed in Z359.16, Section 3.2.5.2, and reads as follows:

> 3.2.5.2 Locking Function. When tested in accordance with 4.2.3, the carrier sleeve shall lock on the carrier and the maximum movement of the carrier sleeve along the carrier "L" shall not exceed 20 inches (508mm) or the total vertical displacement of the test weight including any extension of energy absorbing elements "H" shall not exceed 39 inches (1m).

Thus, the X3's purpose is to arrest a fall "in no more than 39 inches." Section 3.2.5.1 of Z359.16 addresses "Fall Arrest Function." This section provides:

3.2.5.1 Locking on the Carrier. Carrier sleeves shall be automatic in their locking (fall arrest) function. If the carrier sleeve includes an external lever or other actuating feature that requires relative movement (pivot, rotate, etc.) to initiate locking of the sleeve, then a second independent locking means to initiate locking is required, which cannot be disengaged or interfered with during a fall event by reflexively grabbing the carrier sleeve.

Pursuant to this section, cable sleeves should incorporate independent means to initiate locking to provide redundancy and to reduce the possibility of overriding the locking feature of the carrier.

Internally, 3M's X3 contains a "brake cam" that engages on the cable to arrest the fall of a worker using the system. When the worker is climbing, the external handle lifts up and releases the brake cam off the cable, which prevents the cam from braking against the cable, and allows the worker to move freely:



If the worker falls, the handle is designed to move down and mechanically activate the cam brake inside the X3. However, if the worker, at the initiation or beginning of a fall, reflexively grabs the device, the handle can remain in the up position, which prevents the brake cam from

mechanically activating (a "panic grab"). Teresko's expert, Dr. Mark Russell ("Dr. Russell"), opines that when a "panic grab" also involves a "lateral force" on the handle, the secondary braking system (the inertial activation of the cam brake) can be defeated. The handle/energy absorbing arm appears extended out on the subject X3:



3M's corporate designee agreed that a lateral load on the handle would push the handle "in the opposite direction of the device."

The ANSI Z359.16 standard recognizes the "possibility that the device may be deactivated if reflexively grabbed or held during onset of a fall. This reflexive reaction is often referred to as a 'panic grab.'" Based on the references to "panic grab" in the ANSI standard, Dr. Russell contends that a "panic grab" is a well-known phenomenon in the industry and is foreseeable to manufacturers. Further, relevant to Dr. Russell's opinion that the X3 is defective and unreasonably dangerous, Teresko asserts that 3M was aware of at least one other case in which Dr. Russell alleged that lateral load to the handle defeated the X3's braking. Teresko's experts also opine

that at least three prior cases could have provided 3M notice of the defect, or at least have given 3M reason to investigate this failure mode.

3M's retained fall protection engineering expert, Greg Small ("Small"), stated the following regarding the "panic grab" phenomenon:

> When someone begins to fall, our nervous systems react faster than we can consciously think. We grasp at structures that are stationary in an attempt to slow and hopefully stop our fall. Where stationary horizontal structures are within reach, we try to hook our hands and arms over them or if small enough, we grasp them (encircle them) with enough strength (and friction) to resist, slow or stop the fall. Where stationary vertical structures are within reach, we tend to squeeze them as hard as we can to create upward friction which will slow or ideally stop our fall . . . .
>
> [ . . . . ]
>
> In classic "Panic Grab", there are rare (but foreseeable) incidents where the hand has grasped and squeezed the fall arrester on the cable, and held it open, preventing the locking lever from falling and thus preventing the cam from engaging to arrest the fall. Even if there is time for the conscious mind to think about letting go of the fall arrester and allowing it to then lock onto the cable, panic often over-rides any conscious realization that the best way to stop the fall is to let go, and may cause the falling person to squeeze the fall arrester even harder as the subconscious mind mistakenly attempts to deform it to develop friction with the cable.

With regard to the "panic grab," the ANSI Z359.16 standard states:

> If the carrier sleeve includes an external lever or other actuating feature that requires relative movement (pivot, rotate, etc.) to initiate locking of the sleeve, then a second independent locking means to initiate locking is required, which cannot be disengaged or interfered with during a fall event by reflexively grabbing the carrier sleeve.

3M's internal test procedures do not specifically measure the amount of lateral force on the handle necessary to defeat the X3's inertial brake. Dr.

Russell asserts that the following picture is an example of how a user could grab the X3 while putting lateral force on the handle to defeat the inertial braking:



Dr. Russell conducted a series of tests to develop his opinions in this case. One of Dr. Russell's tests appears to be a modification to the ANSI Z359.16 standard locking function test. The tests were different from the three tests prescribed by ANSI Z359.16 because the particular fail mode of the X3 is not directly addressed by ANSI's suggested tests.

In one test, Dr. Russell tested the X3 with lateral force to the handle and will opine at trial that the X3 will not brake in such a scenario. Dr. Russell will testify that the test was set up to "recreate a lateral force with this device that could be applied by the human hand." Dr. Russell will opine that Teresko's fall was caused by an unintentional "panic grab" defeating the X3's braking, which failed to arrest Teresko's fall as it was designed to do. Small will disagree with Dr. Russell's testing methodology, the foreseeability of Teresko's injury, and whether Dr. Russell's proposed alternative design would have arrested Teresko's fall.

Regarding an alternative design, Dr. Russell proposes that the X3's design be modified so that a metal post upon which the device's locking

Page 8 of 20
Case 2:22-cv-01532-JPS   Filed 10/24/23   Page 8 of 20   Document 48

lever and cam rotate, include a larger metal ridge. He opines that the ridge would prevent axial forces applied to the locking lever from being transmitted to the cam. Dr. Russell contends that the modification would add an insignificant amount of weight to the X3's design and would involve different fabrication tolerances:



Dr. Russell asserts that the inclusion of the ridge on the shaft and the redesign of the bushing are "practical from a technology and an economics perspective" and "could have been implemented" at the time of the subject X3's manufacture. Dr. Russell's opinion is buttressed by the fact that the development of this alternative design took "less than 40 hours," and cost less than $200. Russell opines that 3M's production cost would be minimally affected, if at all. 3M's corporate designee agreed that there are multiple ways to design out this potential failure mode and that 3M could probably make the change proposed by Dr. Russell.

Teresko had used the subject X3 numerous times before and had personally tested it approximately 100 times. In Teresko's historical use of the product, he consistently followed the user instructions in visually examining and testing the device prior to every ascent and descent of a

tower. Teresko testified that if it failed a visual inspection or test, he would not have used the product.

The X3's manual states: "Do not handle or remove the sleeve from the carrier cable when passing the cable guides or if the sleeve locks." An informational sticker on the X3 states: "[D]o not grasp the sleeve or cable while actively climbing." The X3's instructions go on to state that misuse could "result in serious injury or death." Teresko acknowledged reading and understanding the X3's instructions. The manual does not use the term "panic grab."

Grasping the sleeve or the vertical cable on which it is attached while actively climbing runs contrary to the language on the X3's warning and its user instructions. Dr. Russell agrees that if Teresko had not touched the X3, it would have arrested his fall.

3. ANALYSIS

Summary judgment is entirely inappropriate in this case. At best, the instant motion for summary judgment is an underdeveloped Federal Rule of Evidence 702 motion. At worst, it asks the Court to make weight and credibility determinations between the parties' respective experts that are within the exclusive province of the jury. *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony."). In the interest of thoroughness, however, the Court will address the legal issues that it is empowered to decide at this juncture.

### 3.1 Strict Liability – Reasonable Alternative Design

The parties agree that Wisconsin law governs this diversity action. ECF No. 36 at 4; ECF No. 46 at 4. To establish design defect strict liability under Wisconsin law, Teresko must prove

Page 10 of 20
Case 2:22-cv-01532-JPS   Filed 10/24/23   Page 10 of 20   Document 48

> (a) That the product is defective because it . . . is defective in design . . . . A product is defective in design if the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe . . . .
>
> (b) That the defective condition rendered the product unreasonably dangerous to persons or property.
>
> (c) That the defective condition existed at the time the product left the control of the manufacturer.
>
> (d) That the product reached the user or consumer without substantial change in the condition in which it was sold.
>
> (e) That the defective condition was a cause of the claimant's damages.

Wis. Stat. § 895.047(1). 3M argues that Dr. Russell's proposed alternative design is not reasonable as required by the first element. ECF No. 36 at 4.

The parties vehemently dispute the requirements to show reasonableness under Wisconsin law. 3M asserts that last year, the Wisconsin Supreme Court "observed" that a five-factor test "may inform the reasonableness of a design." *Id.* at 4–5 (citing *Murphy v. Columbus McKinnon Corp.*, 982 N.W.2d 898, ¶ 41 n.24 (Wis. 2022)). Conversely, Teresko insists that this test is not binding law in Wisconsin and, moreover, applies only to assessing whether a product is "unreasonably dangerous" under the second element, not to whether an alternative design is reasonable under the first element. ECF No. 46 at 4–6.

The *Murphy* opinion, as well as other Wisconsin cases, hold that the five-factor test cited by 3M "may be persuasive in regard to the reasonableness of a design," but that only the language set forth in § 895.047 is binding. 982 N.W.2d, ¶¶ 33–41 & n.24; *see also Sumnicht v. Toyota Motor*

*Sales, U.S.A., Inc.*, 360 N.W.2d 2, 17 (Wis. 1984) ("The United States Court of Appeals for the Seventh Circuit, in applying Wisconsin law, has suggested five factors which should be examined when determining the reasonableness of a design. This list may be beneficial to plaintiffs in proving their case, but these factors are clearly permissive.") (citing *Collins v. Ridge Tool Co.*, 520 F.2d 591, 594 (7th Cir. 1975)). In other words, while the legislature adopted language from the Restatement (Third) of Torts § 2 in § 895.047(1)(a), any extra-statutory tests from the Restatement or otherwise do not carry over. *Murphy*, 982 N.W.2d, ¶ 35.[4] Thus, the Court concludes that the five-factor test is a helpful analytical tool but not a binding analysis.[5]

The Court further agrees that the test has traditionally been invoked in Wisconsin to assess whether an existing design is unreasonably dangerous, not to assess the reasonableness of an alternative design. To start, the five factors set forth in the test are

> 1) [C]onformity of *defendant's* design to the practices of other manufacturers in its industry at the time of manufacture; 2) the open and obvious nature of the alleged danger; . . . 3) the extent of the claimant's use of the very product alleged to have caused the injury and the period of time involved in such use by the claimant and others prior to the injury without any harmful incident . . . 4) the ability of the manufacturer to eliminate danger without impairing the product's usefulness or making it unduly expensive; and 5) the relative likelihood of injury resulting from the product's *present design*.

---

[4]The Court declines 3M's invitation to revisit the Wisconsin Supreme Court's analysis of the Wisconsin legislature's intent. ECF No. 47 at 6.

[5]It bears noting that 3M's proposed jury instructions do not include the five-factor test. ECF No. 40.

*Murphy*, 982 N.W.2d, ¶ 41 n.24 (quoting *Sumnicht*, 360 N.W.2d at 17) (emphasis added). All five factors address the product as currently designed by the defendant. This reading is bolstered by the fact that § 895.047(3)(b) sets forth a rebuttable presumption that a product is not defective when it conforms with relevant industry standards. Case law has made clear that the defense is rebuttable because evidence may show that "[products] which comply with [industry standards] could nonetheless have safety-related defects." *Vanderventer v. Hyundai Motor Am.*, 983 N.W.2d 1, ¶ 90 (Wis. Ct. App. 2022).

3M contends that Teresko fails to establish the first element because, at the time the motion was filed, Dr. Russell had not performed any testing of his alternative design under the ANSI Z359.16 standard, which represents an industry consensus, or under applicable Occupational Safety and Health Administration ("OSHA") standards. ECF No. 36 at 5. But this argument flips the five-factor reasonableness test on its head. Wisconsin law simply does not require a plaintiff to produce and test a prototype against industry standards. *See Vanderventer*, 983 N.W.2d, ¶ 90.

However, while testing of the alternative design is not required for Teresko to establish his claim for design defect strict liability for purposes of summary judgment, "[i]n alternative design cases, [the Seventh Circuit] ha[s] consistently recognized the importance of testing the alternative design as a factor that the district court should consider in evaluating the reliability of the proposed expert testimony." *Winkler v. Madix, Inc.*, No. 16 C 341, 2018 WL 4286197, at *4 (N.D. Ill. Sept. 7, 2018) (quoting *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001)).

Dr. Russell had performed several tests on his proposed alternative design at the time of the filing of the motion, including what appears to be

Page 13 of 20
Case 2:22-cv-01532-JPS    Filed 10/24/23    Page 13 of 20    Document 48

a modified version of one of the three ANSI Z359.16 standard tests (the locking function test). Although Dr. Russell had not tested his proposed alternative design under the ANSI Z359.16 standard tests or OSHA tests at the time of the motion, he has now tested it under the ANSI Z359.16 standard dynamic performance test (another of the three ANSI tests, *see* ECF No. 46-6 at 15), "the only test relevant to the failure mode at issue here." ECF No. 46 at 10. He did not previously test his prototype under that test because 3M had produced documentation that the X3 had already passed the pertinent tests and "the minor alteration did not change anything that would impact the X3's performance in those tests . . . ." *Id.* at 10.

    3M argues that it received late notice of the testing, leading to Small being unable to view the testing (though 3M's counsel did view it). ECF No. 47 at 9. As a result, 3M requests that Teresko not be permitted to "rebut [its] motion" with the testing, citing a series of cases excluding ex parte expert tests at trial, giving little weight to ex parte expert tests disclosed for the first time at trial, or ordering a visual inspection where expert tests were conducted without adequate notice. *Id.* (citing *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1549 (Fed. Cir. 1984); *Kraftco Corp. v. Beatrice Foods Co.*, 342 F. Supp. 1361, 1380–81 (D.N.J. 1971); and *Donat v. Trek Bicycle Corp.*, No. CIV. 13-5052-JLV, 2014 WL 2559317, at *3–4 (D.S.D. June 6, 2014)). As already noted, however, this is a clear Rule 702 issue that may be taken up separately from the instant motion, should 3M wish to renew the issue in that form. The same is true with 3M's contention that Teresko should designate an individual from the testing laboratory as an expert witness, in lieu of Dr. Russell, to opine on the testing procedure. *Id.* at 10.

    Finally, 3M maintains that Teresko has not produced sufficient evidence to put the question of feasibility of his proposed alternative design

to the jury. ECF No. 36 at 5–6; ECF No. 47 at 6–8. On these topics, Dr. Russell submits that he spent less than 40 hours developing his proposed alternative design and that the cost of materials was less than $200, rendering it easily manufacturable in the industry. ECF No. 47 at 6. He also reiterates that his proposed change would be minimal, *id.* at 7, and Teresko argues that 3M's corporate representative testified that 3M could "[p]robably" make design changes off of Dr. Russell's data, *id.*

As with the testing of an alternative design, *Murphy* makes clear that the cost and technical feasibility elements set forth in the Restatement (Third) of Torts § 2 are not incorporated in § 895.047(1)(a). 982 N.W.2d, ¶¶ 33–35. Thus, the Court must conclude that, though relevant for the jury, the cost-effectiveness or technical feasibility of the alternative design "[is] not *require[d]* . . . to prevail on a design-defect claim." *Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1014 (7th Cir. 2020) (concluding same based on Indiana law). For all these reasons, 3M's motion for summary judgment is denied in this respect.

### 3.2 Strict Liability and Negligence – Product Misuse

The Court makes quick work of 3M's claim that "all of [Teresko's] claims" fail because his alleged panic grab constitutes misuse of the X3. ECF No. 36 at 6. Wis. Stat. § 895.047(3)(c) provides that, as to design defect strict liability, "[t]he damages for which a manufacturer, seller, or distributor would otherwise be liable shall be reduced by the percentage of causal responsibility for the claimant's harm attributable to the claimant's misuse, alteration, or modification of the product." Similarly, as to negligence, Wisconsin recognizes the open and obvious danger defense, which allows for the weighing of negligence under the comparative negligence statute when a plaintiff "voluntarily confronts an open and obviously dangerous

condition and a reasonable person in the plaintiff's position would recognize the condition and the danger the condition presents." *Kloes v. Eau Claire Cavalier Baseball Ass'n, Inc.*, 487 N.W.2d 77, 81 (Wis. Ct. App. 1992) (citing Wis. Stat. § 895.045 and *Griebler v. Doughboy Recreational*, 466 N.W.2d 897, 898 (Wis. 1991)).

3M argues that the X3's label and instructions repeatedly warn against touching the X3 or cable while actively climbing, which is reiterated in OSHA standards. ECF No. 36 at 6. Dr. Russell concurs that grasping the X3 while actively climbing would violate the X3's instructions and opines that the X3 would have arrested Teresko's fall if he had not touched it. *Id.* Teresko had personally tested the X3 approximately 100 times prior to the incident and confirmed that he understood the warning about touching the X3 while it is in use. *Id.*

"The apportionment of negligence is ordinarily a question for the jury." *Huss v. Yale Materials Handling Corp.*, 538 N.W.2d 630, 637 (Wis. Ct. App. 1995) (citing *Kloes*, 487 N.W.2d at 81). "The instances in which a court may rule that, as a matter of law, the plaintiff's negligence exceeds that of the defendant are extremely rare." *Id.* (citing *Davis v. Skille*, 107 N.W.2d 458, 462 (Wis. 1961)). This is simply not one of those rare cases, such as when a person dives headfirst into a shallow swimming pool and later complains of injury. Viewing the record in the light most favorable to Teresko, Small, just like Dr. Russell, opines that panic grabs are foreseeable by the manufacturer and capable of overriding any "conscious realization that the best way to stop the fall is to let go." ECF No. 46-6 at 7. Teresko also avers that three separate instances put 3M on notice of the issue prior to his accident.

The jury may draw any range of inferences from the evidence before it, including Teresko's level of consciousness and the fact that he does not remember his fall. *Huss*, 538 N.W.2d at 637 ("The jury's determination may range widely in this case depending on the inferences it draws from the evidence. The jury may determine that [the defendant] was not negligent or was casually negligent to a small degree . . . . [or] that [the plaintiff] was only minimally negligent based upon the work rules, the environment within which he was operating and the rest of the circumstances surrounding the accident."). This issue is firmly within the province of the jury, and 3M's motion for summary judgment will be denied in this respect.

### 3.3  Strict Liability and Negligence – Evidence of Panic Grab

3M argues that Teresko's claims fail because there is no evidence to support that he panic grabbed the X3. ECF No. 36 at 6. On reply, 3M bolsters this argument with an assertion that Small will testify that a panic grab, as Dr. Russell describes it, is "biomechanically improbable because the X3 sits low relative to a user's hands during active climbing, is out of sight, and locks too quickly for a user to grab while falling." ECF No. 47 at 4.

The latter argument was raised for the first time on reply and is therefore waived. *Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019) ("[A]rguments raised for the first time in a reply brief are waived.") (citing *United States v. Vitrano*, 747 F.3d 922, 925 (7th Cir. 2014) and *United States v. Alhalabi*, 443 F.3d 605, 611 (7th Cir. 2006)). Even if it were not, this lone sentence, even coupled with one other sentence attacking Dr. Russell's alternative design as "rel[ying] on a lateral force device that . . . does not replicate a human hand," ECF No. 36 at 5, is insufficient to allow the Court to assess the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that

analysis." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)).

With respect to the former argument, 3M argues that there is no evidence that a panic grab occurred because Teresko has no memory of the incident and again because Small testifies that a panic grab as described by Dr. Russell is biomechanically improbable. ECF No. 36 at 6; ECF No. 47 at 4. However, a plaintiff's claim does not fail for lack of evidence just because he is unable to remember the accident. *See Ritter v. Penske Trucking Leasing Co., L.P.*, 828 N.W.2d 593, ¶¶ 8–10 (Wis. Ct. App. 2013).

Further, and once again, the argument—though raised in the moving brief—is not fleshed out until the reply brief. And most importantly, even if it were adequately raised, 3M effectively asks the Court to weigh Small's opinion that a panic grab is not possible against Dr. Russell's opinion that Teresko would not have fallen without a panic grab. Absent a fully developed expert challenge that raises appropriate questions of admissibility (and not of weight), which has not been done in the instant motion, the Court will say no more on the issue. 3M's motion for summary judgment is also denied in this respect. Because 3M's arguments for summary judgment on Ms. Teresko's loss of consortium claim rely on the success of its other arguments, ECF No. 36 at 7, its motion is denied as to that claim as well.

4. **CONCLUSION**

The Court adopts the parties' stipulation of dismissal of Teresko's manufacturing and instructional defect strict liability claims, ECF No. 46-6 at 2 n.3, 21, and will dismiss those claims without prejudice. For the reasons explained above, the Court denies as moot Plaintiffs' motion to strike, ECF No. 42, and denies 3M's motion for summary judgment, ECF No. 35.

With trial right around the corner, the Court will further order Plaintiffs to file a second amended complaint either identifying ABC Insurance Company or removing ABC Insurance Company within **fourteen (14) days** of this Order. The Court understands the importance of ABC Insurance Company as a real party in interest to this action, but Plaintiffs have had plenty of time to conduct discovery as to the identity of ABC Insurance Company. *See Lindsey v. Molina Healthcare of Wis., Inc.*, No. 22-CV-1295-JPS, 2023 WL 2597084, at *4 (E.D. Wis. Mar. 22, 2023); *see also Billman v. Ind. Dep't of Corr.*, 56 F.3d 785, 789 (7th Cir. 1995) ("[Plaintiff's] initial inability to identify the injurers is not by itself a proper ground for the dismissal of the suit. Dismissal would gratuitously prevent [plaintiff] from using the tools of pretrial discovery to discover the defendants' identity."). The time has come to tie up all loose ends and get this case adequately and fully prepared for trial.

In the same vein, given that this case will be tried on December 18, 2023, changes to Rule 702 will be in effect.[6] The Court expects the parties to carefully review the purpose and effect of those changes and to ensure that any Rule 702 motions cite and apply the appropriate standards. *See* Mem. from Hon. Patrick J. Schiltz, Chair, Advisory Comm. on Evid. Rules to Hon. John D. Bates, Chair, Comm. on Rules of Prac. & Proc. (May 15, 2022), *available at* https://perma.cc/D8D7-RC84 (last visited Oct. 19, 2023).

Accordingly,

**IT IS ORDERED** that the parties' stipulation of dismissal of Plaintiff Rytis Teresko's manufacturing and instructional defect strict liability claims, ECF No. 46-6 at 2 n.3, 21, be and the same is hereby **ADOPTED**;

---

[6] The Federal Rules of Evidence generally apply in diversity cases. *Stutzman v. CRST, Inc.*, 997 F.2d 291, 295 (7th Cir. 1993) (collecting cases).

**IT IS FURTHER ORDERED** that Plaintiff Rytis Teresko's manufacturing and instructional defect strict liability claims, ECF No. 11 at 5–6, be and the same are hereby **DISMISSED without prejudice**;

**IT IS FURTHER ORDERED** that Plaintiffs Rytis Teresko and Edita Teresko's motion to strike, ECF No. 42, be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Defendant The 3M Company's motion for summary judgment, ECF No. 35, be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that Plaintiffs Rytis Teresko and Edita Teresko **FILE** a second amended complaint either identifying ABC Insurance Company or removing ABC Insurance Company within **fourteen (14) days** of this Order.

Dated at Milwaukee, Wisconsin, this 24th day of October, 2023.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge