UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| **Rytis Teresko** and **Edita Teresko**,<br>    Plaintiffs,<br>and<br>**Liberty Mutual Insurance** and<br>**Blue Cross Blue Shield of Illinois**,<br>    Involuntary Plaintiffs,<br>vs.<br>**3M Company**,<br>    Defendant. | Court File No. 2:22-cv-01532 |

## 3M Company's Motion for Judgment as a Matter of Law under Rule 50(a)

3M Company files this Motion for Judgment as a Matter of Law under Rule 50(a) and requests that the Court render judgment on Plaintiffs' claims and theories as set forth below.

### Argument

**A.    JMOL standard.**

Pursuant to a motion for judgment as a matter of law, the court resolves issues against a party and grants judgment against the party on a claim if there is a legally insufficient evidentiary basis to support the claim. *See* Fed. R. Civ. P. 50(a).

**B.    The evidence is legally insufficient to support an affirmative finding on strict products liability.**

Under section 895.047, to prove a product was defective in design, which caused damages, Plaintiffs are required to prove, among other elements, that (1) foreseeable risks of harm posed by the X3 could have been reduced or avoided by the adoption of a reasonable alternative design, (2)

the omission of the alternative design rendered the X3 not reasonably safe, and (3) the X3 not being reasonably safe due to its defective design was a cause of Plaintiffs' damages. *See* Wis. Stat. § 895.047(1)(a), (e); *Murphy v. Columbus McKinnon Corp.*, 405 Wis. 2d 157, 164-65, 982 N.W.2d 898, 902 (2022). Plaintiffs' evidence regarding these elements, although touching on some parts of them, is materially incomplete and does not support submission of the strict products liability claim to the jury.

Plaintiffs have presented evidence that its engineering expert, Dr. Mark Russell, tested an unmodified X3 and determined that it took up to around 17.5 lbs of lateral-load force for the X3's stopping mechanisms to not work. Dr. Russell tested his modified X3 up to around 29 lbs of lateral-load force and the stopping mechanisms still worked, but he did not test the modified device above this load amount or to failure. Based on his testing, Dr. Russell opined that Mr. Teresko's accident occurred because he panic-grabbed the X3 during his fall in such a manner that the lateral-load force of his grip prevented the stopping mechanisms from working, which would not have happened had the modified X3 been used.

Wholly missing from the equation is evidence to connect Dr. Russell's testing results to his causation opinion. There is no evidence, through a biomechanical expert or otherwise, regarding what lateral-load forces a human is likely to exert on an X3 when grabbing it during a fall or even in general. And there is no evidence regarding how wearing ski gloves affects grabbing forces. If Rytis Teresko likely would not have applied more than 17.5 lbs of lateral load, then the alleged grab could not have been the failure mechanism. And if he likely would have applied more than 29 lbs of lateral load, then it is unknown whether the alternative design would have prevented the fall. It is unknown whether the 11.5 lbs difference between 17.5 lbs and 29 lbs (or even 22.5 lbs difference between 6.5 lbs and 29 lbs, if the 6.5 lbs amount from Dr. Russell's early, deficient

2

Case 2:22-cv-01532-JPS   Filed 08/22/24   Page 2 of 15   Document 109

testing is used) between an unmodified X3's lateral-load failure point and the modified X3's highest tested lateral-load amount has any relation to the forces a human grabbing the device likely would apply. For all the jury knows, this difference may be negligible relative to the forces a human hand likely would have applied. Or it may be that the average force a human (or the average force a strong man who regularly lifted weights like Teresko) grabbing the device would apply is above 29 lbs, meaning it is unknown whether the modified X3 would have failed or not.

Viewing all of the evidence in the light most favorable to Plaintiffs, they did not present evidence that a reasonable alternative design exists or that the alternative design's omission rendered the X3 unreasonably safe. Without proof that the proposed reasonable alternative design likely would have made a difference in its application in the field, the jury must speculate regarding whether the purported reasonable alternative design actually rectified the alleged danger. *See Rivers v. B Braun Interventional Sys. Inc.*, No. 19-CV-988, 2023 WL 7166520, at *13 (E.D. Wis. Oct. 31, 2023) ("Without proof that the finite element analysis accurately modeled the performance of the two filters, Timmins cannot rely on that modeling to support his opinion that filter sold outside the United States was a safer alternative design."); *Nelson v. Johnson & Johnson*, 428 F. Supp. 3d 1, 5 (E.D. Wis. 2019) ("Where there are no safer alternatives, it deprives [plaintiff] of her right to recover, even though the product is unreasonably dangerous."). No evidence supports a finding that Dr. Russell's alternative design would have eliminated the risk of harm. *See Rogers by Rogers v. K2 Sports, LLC*, 348 F. Supp. 3d 892, 903 (W.D. Wis. 2018) ("Plaintiffs need to show only that a reasonable alternative design would have eliminated the risk of harm."). Unlike the proposed alternative design in *Murphy*, nothing here supports a finding that adoption of the modified X3 would have prevented Teresko's accident. *See Murphy*, 405 Wis. 2d at 188, 982 N.W.2d at 913 ("[T]he foreseeable risks of the Dixie tongs could have been reduced or avoided by

the adoption of a reasonable alternative design and CMC's omission of a reasonable alternative design rendered the Dixie tongs not reasonably safe."). Therefore, no evidence supports a finding that a design defect existed, let alone one that was a cause of the accident. *See* Wis. Stat. § 895.047(1)(a), (e); *Cioni v. Samsung Cell Phone Co.*, No. 23-CV-302-JDP, 2023 WL 6961853, at *1 (W.D. Wis. Oct. 20, 2023) (recognizing that section 895.047(e) requires a showing that the "omission of the alternative design must have caused the [injury]."); *Dalton v. Teva N. Am.*, 891 F.3d 687, 692 (7th Cir. 2018) (explaining, under Indiana law, that "a judgment for the plaintiff in this case would require the jurors to speculate about the existence of a defect, the reason for the proven defect, and that the proven defect caused the break" in the medical device).

Similarly, Plaintiffs' negligence claim also fails because there is no evidence that, had Teresko been using a different cable-grab device on the day of the accident, it would have prevented his fall. This is because foreseeability is an element of a negligent design negligence claim under Wisconsin law, which requires that the "foreseeable risk of harm posed by the product could have been reduced or avoided by adoption of a reasonable alternative design." *Godoy ex rel. Gramling v. E.I. du Pont de Nemours & Co.,* 2007 WI App 239, ¶ 8, 306 Wis. 2d 226, 235–36, 743 N.W.2d 159, 164, *aff'd as modified,* 2009 WI 78, ¶ 8, 319 Wis. 2d 91, 768 N.W.2d 674 (affirming negligent design claim because "as we have seen there is no 'alternate design' to make white-lead carbonate without using lead."). Because Plaintiffs have legally insufficient evidence that Dr. Russell's modified X3 would have prevented Mr. Teresko's fall, Plaintiffs' negligence claim likewise fails.

C.  **The evidence is legally insufficient to support an affirmative finding on breach or causation for strict products liability and negligence.**

To prove their cause of action under any theory of recovery—whether negligence or strict liability—Plaintiffs must prove causation. *See* Wis. Stat. § 895.047(1)(e); *Howes v. Deere & Co.*,

238 N.W.2d 76, 80 (Wis. 1976). Specifically, Plaintiffs must come forward with sufficient evidentiary facts that remove the issue of causation from speculation. But that did not happen.

"To establish causation in Wisconsin, the plaintiff bears the burden of proving that the defendant's negligence was a substantial factor in causing the plaintiff's harm." *Ehlinger v. Sipes*, 155 Wis. 2d 1, 12, 454 N.W.2d 754, 758 (1990). "The phrase 'substantial factor' denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense." *Zielinski v. A.P. Green Indus., Inc.*, 2003 WI App 85, ¶16, 263 Wis. 2d 294, 661 N.W.2d 491 (citation omitted). "[If] there is no credible evidence upon which the trier of fact can base a reasoned choice between . . . two possible inferences, any finding of causation would be in the realm of speculation and conjecture." *Id.* (citation omitted; brackets and ellipses in *Zielinski*).

"Before the case may reach the jury, the plaintiff must present a quantum of evidence sufficient to render the eventual answer non-speculative." *Correa v. Woodman's Food Mkt.*, 2020 WI 43, ¶16, 391 Wis. 2d 651, 943 N.W.2d 535. The plaintiff "must come forward with evidentiary facts that establish the ultimate facts; and the degree of proof must be such as to remove these ultimate facts from the field of mere speculation and conjecture." *Zillmer v. Miglautsch*, 35 Wis. 2d 691, 700, 151 N.W.2d 741 (1967). While a judge and jury "may, of course, draw logical inferences from the evidence, connecting its dots into a coherent pattern," *Correa*, 391 Wis. 2d 651, ¶21 (citation omitted), "[a] jury cannot be allowed to merely theorize negligence from what might be a mere possibility," *Zillmer*, 35 Wis. 2d at 700.

As is the case here, Wisconsin courts have repeatedly addressed situations in which there is no evidence as to what happened at the time the injury occurred. *See, e.g., Rush v. Twin City Fire Ins. Co.*, 2023 WI App 1, 984 N.W.2d 743, 2022 WL 17258855 (Nov. 29, 2022) (per

5

Case 2:22-cv-01532-JPS    Filed 08/22/24    Page 5 of 15    Document 109

curiam). In *Rush*, the Court of Appeals of Wisconsin held that the plaintiff's claims failed because "she ha[d] not presented facts that remove the issue of causation from speculation." *Id.*, ¶13. The plaintiff, Rush, asserted claims of negligence and a violation of the safe place statute "arising out of a slip and fall accident on a sidewalk curb." *Id.*, ¶1. Rush argued that "she presented sufficient evidence to allow a reasonable jury to draw a logical inference that the condition of the sidewalk caused her to fall." *Id.* However, Ms. Rush lacked any recollection of the incident because of her injuries, and there were no eyewitnesses to the incident. *Id.*, ¶5. Additionally, Rush "had no facts to offer and offered no testimony that that foot was necessarily situated on the eroded part of the sidewalk, that it slipped, that it misstepped, that it caused her next step to be impacted in any way." *Id.* (quoting the trial court). In concluding that the evidence in the case was "necessarily speculative" on the issue of causation, the court recounted:

> She again testified that she did not remember her foot touching anything when she stepped down and doesn't remember slipping. She didn't recall whether she stepped on anything that felt loose when she stepped down. From the record and her testimony, there is no evidence that the eroded part of the curb had any effect on her fall. In fact, the only evidence suggest[ed] that she fell after she put her foot down on the black—towards the blacktop.
>
> . . .
>
> [I]t doesn't appear from these facts that a jury could make any reasonable inferences that with all the absence of facts regarding the curb itself, that that eroded part of the curb somehow caused her fall.

*Id.*, ¶17 (quoting the trial court). As a result, the court granted summary judgment because "[b]ased on the evidentiary facts offered to the court, no reasonable jury could conclude that [the defendants] caused injury to Rush without resorting to speculation." *Id.*, ¶18.

Here, Plaintiffs have failed to elicit any evidentiary facts from which the jury could conclude that 3M caused Teresko's fall. As was the case in *Rush*, Teresko has no recollection of the incident. (Tr. 600:16-601:6). Additionally, there are no eyewitnesses to the incident of

Teresko—like *Rush*. Plaintiffs have no facts to offer and have offered no testimony regarding the placement of the Subject X3, the placement of his hands and feet immediately before he fell, that he applied any panic grab with a lateral load to the Subject X3, that he engaged in any panic grab on the Subject X3, and any potential cause of Teresko's fall. (*See, e.g.*, Tr. 600:16-601:6). In reviewing the evidence at trial, it is clear that no person can testify as to what happened immediately preceding and during the initial moments of the fall. The only person who has any evidence is Mantas Navickis, who testified that he saw Teresko falling but did not see him begin to fall. (Tr. 190:10-19). Navickis also could not recall seeing Teresko's hands, arms, or legs as he was falling. (Tr. 181:2-5). Consequently, there are no facts in the record to prove that the X3 or any alleged defect in the X3 caused Teresko's fall. Moreover, the evidence presented to the jury proves that it is impossible to panic grab the X3 while falling—Plaintiffs presented no evidence that it was humanly possible to panic grab the device in the extraordinarily fast time it takes the cam—either through the hand brake or the inertial brake—to stop the user.

Without such evidence, the jury is only left to impermissibly speculate as to what actually caused Teresko to fall and his subsequent injuries. Accordingly, Plaintiffs have failed to carry their burden as a matter of law, and the Court should enter directed verdict in favor of 3M and against Plaintiffs on each cause of action.

**D.     Damages for loss of affection of marriage.**

With respect to the Plaintiffs' "wrongful divorce" theory, no damages are permitted. 3M's counsel has conferred with Plaintiffs' counsel, and they agree that Plaintiffs cannot seek these damages.

Under Wisconsin statutory law, "[a] causes of action for breach of contract to marry, alienation of affections . . . are hereby abolished." Wis. Stat. Ann. § 768.01. Wisconsin courts have classified these types of claims as "essentially an alienation of affection claims." *See Prill v.*

*Hampton*, 154 Wis. 2d 667, 681-82, 453 N.W.2d 909, 914-15 (Ct. App. 1990). In *Prill*, the court held that such a claim is barred under public-policy grounds and additionally barred under section 768.01:

> Janet next contends that she should be permitted to prove that Robert's injuries caused the divorce and that she is entitled to damages for "wrongful divorce." This type of claim has not been recognized in the past and we refuse to recognize it now. We conclude that sound public policy reasons preclude claims that a spouse's injuries caused a divorce. While we recognize that there is a strong public policy that permits injured parties to recover damages for their injuries, we also recognize countervailing public policy considerations that should bar claims for wrongful divorce.
>
> Failure of a marriage is rarely attributable to a single cause. In some instances, there may be evidence that the spouse's injuries were, in part, the cause of the marriage's failure. For the jury to properly assess the amount of damages, however, it is necessary to show both a causal relationship and the extent or degree this factor played in the failure of the marriage. Such an inquiry would open to scrutiny very personal issues, not only of the spouse claiming damages, but also of the injured spouse. This factor, along with the difficulty of the jury in determining the extent to which any single cause may have contributed to the failure of the marriage, requires that such claims be rejected.
>
> A second basis for rejecting Janet's claim is Hampton's contention that this is essentially an alienation of affections claim. If so, Janet's claim would clearly be barred by sec. 768.01, Stats., which abolishes all alienation of affection claims. The same public policy reasons supporting the legislature's abolition of these claims also support denial of Janet's claim for wrongful divorce.

*Id.*; *S.J.A.J. v. First Things First, Ltd.*, 2000 WI App 233, ¶ 51, 239 Wis. 2d 233, 619 N.W.2d 307, aff'd, 2001 WI 118, ¶ 51, 247 Wis. 2d 1029, 635 N.W.2d 292 ("She is seeking damages as a result of a 'wrongful divorce,' and for the policy reasons stated in *Prill*, we do not recognize such a cause of action"). The Supreme Court of Wisconsin has declared that, in barring a claim for wrongful divorce based on the negligent conduct of the defendant, the *Prill* court's decision "illustrates just how liberally the provisions of ch. 768 should be construed." *Koestler v. Pollard*, 162 Wis. 2d 797, 804, 471 N.W.2d 7, 10 (1991).

Consequently, Plaintiffs cannot seek damages based on "wrongful divorce." 3M requests that Plaintiffs be prohibited from putting on evidence that their marriage ended because of 3M's alleged wrongdoing, the accident, or Teresko's injuries. 3M also requests a jury instruction that no amount of damages can be awarded based on the Plaintiffs' marriage ending or on Teresko's addiction.

Accordingly, Plaintiffs cannot seek damages based on "wrongful divorce." The Court should grant judgment against Plaintiffs on this issue and provide a jury instruction that no amount of damages can be awarded based on the Plaintiffs' marriage ending.

**E.     Damages for becoming addicted to, and having withdrawal issues involving, opioids.**

With respect to Teresko's claim for damages based on 3M's wrongdoing allegedly causing his opioid addiction and subsequent withdrawal and the correspondent effects such as his behavior that led to things such as his arrest and severe depression, such recovery should be barred under public policy.

"[U]nder Wisconsin law, '[p]roximate cause involves public policy considerations for the court,' although the term 'proximate cause' is no longer used." *Webber v. Armslist LLC*, 70 F.4th 945, 958 (7th Cir. 2023) (quoting *Fandrey ex rel. Connell v. Am. Fam. Mut. Ins. Co.*, 272 Wis. 2d 46, 680 N.W.2d 345, 352-53 (2004)). The Seventh Circuit has recognized the six public-policy factors that Wisconsin uses to determine whether to limit liability as follows:

> (1) The injury is too remote from the negligence; (2) Recovery is too wholly out of proportion to the culpability of the negligent tort-feasor; (3) In retrospect it appears too highly extraordinary that the negligence should have brought about the harm; (4) Allowing recovery would place too unreasonable a burden upon the tortfeasor; (5) Allowing recovery would be too likely to open the way to fraudulent claims; or (6) Allowing recovery would enter a field that has no sensible or just stopping point.

*Id.* (quoting *Fandrey*, 680 N.W.2d at 348 n.1 (cleaned up)). "Because these factors are set out in the disjunctive, a finding that one is satisfied is sufficient to preclude liability." *Id.*

Moreover, "[t]he application of these public policy factors is a question of law" for the courts to decide with "due respect for legislative choices." *Id.* "In conducting the public policy analysis, Wisconsin courts have tread carefully when it comes to subject matters that are 'highly regulated by the legislature.'" *Id.* at 959 (quoted source omitted). "On those topics, the Wisconsin Supreme Court has expressed a particular reluctance 'to create liability where the legislature has not expressed that there should be any.'" *Id.* (quoted source omitted). "That court has sometimes addressed the relevance of legislative enactments under the sixth public policy factor; on other occasions, it has considered certain statutes apart from its discussion of the relevant factors." *Id.*

The opioid crisis and effects of opioid addiction have been the subject of much legislation in Wisconsin. The Wisconsin Legislature established the HOPE (Heroin and Opioid Prevention and Education) Agenda, which was a series of bills to address the opioid crisis and opioid addiction. *See* https://docs.legis.wisconsin.gov/misc/lrb/lrb_reports/lrb_reports_2_6.pdf. The Legislature has regularly and repeatedly spoken on the issue of opioids and opioid addiction but has never seen fit to pass a statute that made tort defendants liable when injured plaintiffs become addicted to opioids. *See* https://legis.wisconsin.gov/assembly/hope/legislation/.

Here, the Court should not allow the jury to consider awarding damages for Teresko allegedly becoming addicted to opioids, then suffering withdrawal symptoms based on the his stopping the drug, because this alleged injury is too remote from any wrongdoing, and in retrospect it appears too highly extraordinary that any wrongdoing should have brought about the harm—a plaintiff becoming addicted to opioids, and then suffering withdrawal symptoms that negatively impacted his life, are not reasonably foreseeable by a product manufacturer, especially because a plaintiff's medical providers are expected to monitor and manage his medications to prevent dependency and withdrawal issues.

For the same reason, recovery for a plaintiff becoming addicted to, and suffering withdrawal effects of, opioids would place too unreasonable a burden upon the tortfeasor and be wholly out of proportion to the culpability of the tortfeasor because of its indirect, tenuous, and not reasonably foreseeable nature to any alleged tort. The majority, or at least a very significant part, of Teresko's mental pain and suffering—particularly as his physical injuries have healed and improved—is not due to those injuries but is due to his behaviors and actions attributed to the opioids, such as his felony arrest and how he treated family members. It would be unfair, unjust, and nonsensical to saddle 3M with responsibility for Teresko's opioid-related issues when 3M had no role in selecting and managing Teresko's painkillers.

Further, it would likely open the way to fraudulent claims by injured plaintiffs, and recovery would enter a field that has no sensible or just stopping point, because plaintiffs would seek additional damages for not just becoming addicted to opioids but for becoming dependent on any medicines. Medical-care plans usually come with a regimen of future medicines, often for the duration of a plaintiff's life, and it makes little sense to allow for the award of additional damages because of this dependency. Does a third-party get to recover for how the plaintiff treated her when he was suffering withdrawals? Can a plaintiff recover if he gets arrested for abusing opioids and loses his job? Where does such recovery end? *See Vogel v. Liberty Mut. Ins. Co.*, 214 Wis. 2d 443, 450, 571 N.W.2d 704, 707 (Ct. App. 1997) ("If Tank is allowed to recover from a tortfeasor for increased premiums and lost dividends pertinent to a worker's compensation insurance policy that it is required to maintain by law, what next?").

Finally, as explained above, it is the Legislature who should decide whether damages for an injured plaintiff's opioid addiction and withdrawal are recoverable against a tort defendant. *See Graef v. Applied Underwriters, Inc.*, 2024 WI App 32, 7 N.W.3d 717 ("The legislature also

establishes public policy for the state through the statutes it enacts, and we are limited 'to applying the policy the legislature has chosen to enact, and may not impose [our] own policy choices." (citation omitted)).

Accordingly, Plaintiffs cannot seek damages based on Teresko allegedly becoming addicted to opioids. The Court should grant judgment against Plaintiffs on this issue and provide a jury instruction that no amount of damages can be awarded based Teresko becoming addicted to, and withdrawing from, opioids and his result behavior. The Court should grant judgment against Plaintiffs on this issue and instruct the jury not to consider such damages for Teresko and Edita.

### F. The evidence is legally insufficient to support an affirmative finding regarding opioid addiction damages.

Additionally, even if a permitted form of damages, there is legally insufficient evidence supporting submission of the opioid-related damages. Again, in any products liability case—whether under negligence or strict liability—the plaintiff must prove that the alleged defects caused the purported injuries. *See* Wis. Stat. § 895.047(1)(e); *Howes v. Deere & Co.*, 238 N.W.2d 76, 80 (Wis. 1976). In Wisconsin, "[e]xpert testimony is also required to establish whether [a plaintiff]'s injuries were caused by the . . . accident and the extent of her damages." *Hieshetter v Liberty Ins. Corp.*, No. 10-C-807, 2012 WL 947518, at *2 (E.D. Wis. Mar. 20, 2012) (citing *Pucci v. Rausch*, 187 N.W.2d 138, 141 (Wis. 1971)). Moreover, the "statement of a layperson . . . is not accepted as sufficient proof without medical corroboration." *Pucci*, 187 N.W.2d at 141.

Applying the law, Plaintiffs have failed to present legally sufficient evidence that the accident at issue caused Teresko's addictions, withdrawals, and his resulting behavior—a burden that can only be carried via expert testimony. *See Hieshetter*, 2012 WL 947518, at *2; *Pucci*, 187 N.W.2d at 141. None of Plaintiffs' medical experts connected 3M's alleged wrongdoing as

*causing* Teresko's opioid addiction, withdrawals, and resulting behavior. Instead, Plaintiffs only have statements of laypersons, which cannot be "accepted as sufficient proof without medical corroboration." *See Pucci*, 187 N.W.2d at 141. It is unknown *why* Teresko became addicted to the opioids. Was it because his doctors did not manage his medications properly? Was it because Teresko took it upon himself to stop his opioids without conferring with the doctors about tapering or alternative medications? No evidence touches on these issues. Without expert testimony connecting Teresko's addictions and withdrawals to the fall, Plaintiffs have failed to carry their burden. Consequently, the jury should be specifically instructed to disregard and not compensate Plaintiffs for any amount related to Teresko's opioid addictions, withdrawals, and resulting behavior following the accident.

G. **The evidence is legally insufficient to support certain additional considerations of pain, suffering, disability, and disfigurement damages.**

No evidence was submitted to support submission of Teresko's "embarrassment" and "humiliation" in the Wisconsin Civil Instruction 1766 and 1767 instructions. While Teresko testified generally about his physical pain and mental worry, he did not testify about how his injuries have caused him embarrassment or humiliation. Thus, the jury would have to speculate about whether Teresko has suffered embarrassment or humiliation, let alone be able to determine to what degree. Accordingly, "embarrassment" and "humiliation" should be struck from the jury instructions.

H. **The evidence is legally insufficient to support certain issues regarding future health care expenses.**

Regarding future health care expenses, lifecare-plan expert Michelle Albers testified that she included medications in her lifecare plan—not because any medical professional has recommended that Teresko use the medications for any specific period, let alone for the rest of his life—but simply because he was prescribed the medications when she met with him over 18

months ago. That is a legally insufficient reason to include any medications in Teresko's future health care damages.

Similarly, there is no legally sufficient basis for the future psychiatric medication management recommended. Albers attributes this recommendation to Brad Grunert, but he is not a medical doctor who can opine regarding the need for medications.

Thus, the jury should be instructed not to award any amount for these items when considering Teresko's future health care expenses.

**I.      Damages for loss of past nursing services.**

With respect to the Edita Teresko's claim for damages for past nursing services, Plaintiffs did not present legally sufficient evidence to support submission of this claim because they put on no evidence of what is customarily charged for such nursing services. *See Moritz v. Allied Am. Mut. Fire Ins. Co.*, 27 Wis. 2d 13, 27, 133 N.W.2d 235, 243 (1965) ("There is no question but that one who is injured and requires domestic and nursing services is entitled to recover for the same 'what is customarily charged for similar work' and to the extent that there is proof that establishes this item of damages to a reasonable certainty. On the record Mrs. Moritz did not sustain her burden of proof on this item of damages. There is absolutely no evidence of the customary charges for this kind of domestic work."); *see also Reinke v. Woltjen*, 32 Wis. 2d 653, 663, 146 N.W.2d 493, 498 (1966) (approving and applying *Moritz* and holding, "Likewise in the case at hand, there is no proof as to the customary charges for nursing services in the locality nor is the evidence in any sense sufficient to show the extent of the services rendered"). Hence, the Court should grant judgment against Edita on this damages theory.

## Conclusion

3M respectfully prays that the Court will grant this Motion for Judgment as a Matter of Law and for any other relief to which 3M is entitled.

Date: August 22, 2024                             */s/ Gerardo Alcazar*

**Norton Rose Fulbright US LLP**

Gerardo Alcazar (MN #0386522)
Andrew Crowder (MN #0399806)
Jaime Wing (MN #0398585)
60 South Sixth Street, Suite 3100
Minneapolis, MN 55402
T: (612) 321-2800
F: (612) 321-2288
gerardo.alcazar@nortonrosefulbright.com
andy.crowder@nortonrosefulbright.com
jaime.wing@nortonrosefulbright.com

**Thompson, Coe, Cousins & Irons, LLP**

Zandra Foley (TX #24032085)
Andrew Johnson (TX #24060025)
Steven Augustine (TX #24064845)
4400 Post Oak Parkway, Suite 1000
Houston, TX 77027
T: (713) 403-8210
F: (713) 403-8299
zfoley@thompsoncoe.com
ajohnson@thompsoncoe.com
saugustine@thompsoncoe.com

**Quarles & Brady LLP**

Sara Scullen (WI #1030763)
Evan Thomsen (WI #1114697)
411 East Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
T: (414) 277-5000
F: (414) 271-3552
sara.scullen@quarles.com
evan.thomsen@quarles.com

*Attorneys for Defendant 3M Company*