# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

RYTIS TERESKO and EDITA
TERESKO,

                  Plaintiffs,

v.

LIBERTY MUTUAL INSURANCE
COMPANY and BLUE CROSS BLUE
SHIELD OF ILLINOIS,

       Involuntary Plaintiffs,

v.

THE 3M COMPANY,

                Defendant.

Case No. 22-CV-1532-JPS

**ORDER**

## 1.     INTRODUCTION

On February 8, 2020, Plaintiff Rytis Teresko ("Teresko") was employed by Nomad, Inc. ("Nomad") to perform maintenance work on a cellular communications tower located in Milwaukee, Wisconsin. ECF No. 11 at 3. At this time and place, Teresko was using a DBI-SALA Lad-Saf X3 cable sleeve (the "X3") manufactured by Defendant The 3M Company ("3M") to ascend and descend the tower. *Id.* Teresko alleges that, during his descent down the tower, the X3 malfunctioned and did not lock into place, causing Teresko to fall with the X3 still attached to the tower's safety cable. *Id.* at 3–4. Teresko claims that the X3's failure caused him to suffer serious permanent injuries. *Id.* at 4. Teresko brought negligence and strict liability claims (design defect, failure to warn, and manufacturing defect) against

3M, and his ex-wife, Plaintiff Edita Teresko ("Ms. Teresko"), brought a derivative loss of consortium claim. *Id.* at 4–6.

On August 19, 2024, a jury trial commenced as to Teresko's negligence claim, his remaining strict liability claim for an alleged design defect, and Ms. Teresko's derivative loss of consortium claim. ECF No. 118; ECF No. 46-6 at 2 n.3 ("Plaintiffs and 3M have entered into a stipulation to dismiss the failure to warn[,] and manufacturing defect claims and Plaintiffs will not pursue these claims at trial.").

On August 27, 2024, the jury rendered a special verdict finding that: (1) the X3, when it left the possession of 3M and reached Teresko, was "without substantial change in the condition it was sold" and was "in such defective condition as to be unreasonably dangerous"; (2) such defective condition was a cause of Teresko's injuries; (3) 3M was negligent in its design or testing of the X3; and (4) 3M's negligence was a cause of Teresko's injuries. ECF No. 122 at 1–2.[1] The jury also found that Teresko was contributorily negligent in his use of the X3 at the time of his injuries, and that Teresko's negligence was also a cause of his injuries. *Id.* at 3. "Assuming the total conduct that caused . . . Teresko's injuries to be 100%," the jury attributed 20% of that cause to 3M and 80% to Teresko. *Id.*

With respect to damages, the parties had stipulated to the amount of $914,058.46 for past medical expenses, which included sums paid by health insurance and worker's compensation, *see, e.g.*, ECF No. 69. *Id.* at 4; ECF No.

---

[1] As discussed further *infra*, during deliberations, the jury asked, inter alia, to review "the video evidence of [Plaintiffs' expert] Dr. [Mark] Russel[l]'s test of his modified device and 3M's video of testing of [the] unmodified device" and 3M's expert "Dr. [Dennis] Seal's . . . transcripts . . . where he spoke about perception and reaction times." ECF No. 121 at 3–4.

136 at 45. The jury found the following sums of money to be fair and reasonable compensation to Teresko: (1) $200,000 for future medical and care expenses; (2) $80,000 for past loss of earning capacity; (3) $0 for future loss of earning capacity; (4) $50,000 for past pain, suffering, disability, and disfigurement; and (5) $50,000 for future pain, suffering, disability, and disfigurement. ECF No. 122 at 4. The jury finally found that Ms. Teresko sustained injury for loss of consortium because of Teresko's injuries, and it awarded her $15,000. *Id.* at 4–5. However, because the jury found Teresko 80% at fault and 3M 20% at fault, Wisconsin law bars Plaintiffs' recovery. Wis. Stat. § 895.045(1) ("Contributory negligence does not bar recovery in an action by any person or the person's legal representative to recover damages for negligence resulting in death or in injury to person or property, if that negligence was not greater than the negligence of the person against whom recovery is sought . . . .").

Now before the Court are: (1) Plaintiffs' motion for a new trial under Federal Rule of Civil Procedure 59(a)(1)(A), ECF No. 123; and (2) 3M's motion for entry of a take-nothing judgment and renewed motion for judgment as a matter of law under Rule 50(b), ECF No. 124.[2] Plaintiffs

---

[2] The Court ruled, in a written order, on approximately 30 pretrial motions in January 2024, seven months before trial commenced in August 2024. ECF No. 73. Nonetheless, in the days and over the weekend preceding trial, the Court was inundated with hundreds of pages of additional pretrial motions and disputes. ECF Nos. 86, 88, 89, 90, 91, 96, 100, 101, 103, 104, 105; ECF No. 127 at 4, 7 ("[U]nfortunately, the Court has been overwhelmed in the last 48 hours, including after midnight tonight, with between 450 and 500 pages of filings. . . .[I]f there were concerns, [those] should have been made back in February and March but not two or three days before trial. So we're starting this morning with the witnesses and exhibits that were disclosed in the Final Pretrial Report . . . ."). This was particularly frustrating because the trial was originally scheduled for December 2023, but the Court had to reschedule the trial because the parties insisted that they required two weeks to try the case, and the Court did not have availability in

"agree . . . that pursuant to Wisconsin law, if the verdict stands, [they] are not entitled to recovery." ECF No. 139 at 1.

No trial is ever perfect. But ultimately, Plaintiffs' instant pleas for a new trial amount to little more than sour grapes. Plaintiffs alluded during trial to a "scheme" between 3M's counsel and its experts to get a jury to believe 3M's defense theory in this case. ECF No. 136 at 119–20. However, the only "scheme" that the Court gleans from the record in this case is that, until this lawsuit was filed on December 21, 2022—almost three years after the fall—Plaintiffs kept 3M wholly in the dark in two very significant respects. First, not only did Plaintiffs and their retained experts not conduct a thorough and timely "root cause" investigation, but they also never provided 3M with notification of the fall to allow 3M an opportunity to timely conduct its own thorough, independent investigation. For the reasons set forth below, the Court denies Plaintiffs' Rule 59(a)(1)(A) motion for a new trial. ECF No. 123. The Court grants 3M's motion for entry of a take-nothing judgment, and judgment will be so entered, but it denies 3M's Rule 50(b) renewed motion for judgment as a matter of law. ECF No. 124.

## 2.    EVIDENCE ELICITED AT TRIAL

Plaintiffs' theory of the case, and what Plaintiffs hoped the evidence would show, is that "Teresko started a fall, grasped onto the X3 device and overrode both its locking mechanisms[,] causing him to fall 100 feet." ECF

_____

December 2023 for a two-week trial. ECF Nos. 68, 71. The parties ultimately required only four days for the presentation of evidence. ECF No. 118.

Given the timing of these last-minute filings, the Court verbally addressed with the parties those motions and disputes that they specifically raised during the trial. *See generally* ECF No. 118. 3M never verbally raised its motion to exclude Plaintiffs' "shake-test" demonstration, ECF No. 103, and so the Court did not rule on it. The Court therefore now denies that motion as moot.

Page 4 of 95

No. 133 at 97–98. Plaintiffs specifically claim that Teresko "panic grabbed" the X3 *after* he began to sense a loss of balance. ECF No. 123-1 at 7. Plaintiffs assert that Teresko's panic grab applied lateral load to the X3's handle, which defeated both braking mechanisms. *Id.* at 8–9. Conversely, 3M's theory of the case is that Teresko "must have been grabbing the X3 and applying a lateral load *before* he fell because it is impossible to grab the device after a fall initiates." ECF No. 140 at 11 (emphasis added).

The Court will summarize the evidence elicited at trial before addressing the merits of the parties' motions.

### 2.1    3M's X3 Design and Proper Use of X3

The X3 is a fall protection safety device used for climbing:



**Video Image of the X3 from 3M's climbing demonstration video, Trial Exhibit No. 45 at 00:07[3]**

---

[3]The admitted trial exhibits are stored with this District's Clerk of Court. *See* Aug. 27, 2024 Docket Entry. The exhibit list docketed at ECF No. 117 shows those exhibits that were admitted at trial. The Court only cites in this Order to exhibits admitted at trial or used demonstratively at trial.

ECF No. 134 at 67–69; ECF No. 129 at 62. Rick Miller ("Miller") was the X3's lead designer. ECF No. 133 at 100–01. Miller testified in this case on behalf of 3M as its corporate representative. ECF No. 120 at 9.

The X3 is designed so that "if a climber at height los[es] his grip or footing, the X3 would grab onto the cable . . . and protect the climber from serious injury." ECF No. 133 at 107; ECF No. 136 at 83. The X3 has two independent locking mechanisms: the inertial brake and the mechanical arm. ECF No. 133 at 100; ECF No. 134 at 26, 28. The mechanical arm is a lever, and the inertial brake is a cam on a torsion spring. ECF No. 134 at 72. The inertial brake is designed to respond to downward changes in velocity, while the mechanical arm responds to changes in position of the X3 on the cable, including the X3 either dropping or sliding up the cable from a fall backwards. *Id.* at 26, 28, 122; ECF No. 136 at 149. The only way of which Miller is aware to override both locking mechanisms is lateral load to the handle. ECF No. 133 at 99 (Miller's testimony that overriding both locking mechanisms on the X3 "necessarily entail[s] a lateral load"), 100–01.

A climber uses the X3 to climb towers by attaching it to the cable on the tower:



**Video Image of a climber attaching the X3 to the cable from 3M's climbing demonstration video, Trial Exhibit No. 45 at 02:27**

The X3 then connects to the climber's harness and hangs down such that it sits around the climber's belly button. ECF No. 136 at 108; Trial Exhibit No. 45 at 02:08.

While ascending, the proper climbing technique is to maintain an upright body position parallel to the cable and to alternate raising the hands and feet up and down. Trial Exhibit No. 45 at 02:56. To descend, the climber alternates his hands and feet on the pegs or step bolts. ECF No. 136 at 149; Exhibit No. 45 at 03:05. The climber must also keep his body in an upright position to avoid inadvertent lockup:

Case 2:22-cv-01532-JPS    Filed 10/04/24    Page 7 of 95    Document 143



**Video Image of a climber demonstrating the proper climbing technique to descend a tower, from 3M's climbing demonstration video, Trial Exhibit No. 46 at 2**

Trial Exhibit No. 45 at 03:12. In the event the X3 inadvertently locks up, the climber must not grab the sleeve but must instead climb up to release the sleeve and then continue to descend. Trial Exhibit No. 45 at 03:38. To properly bypass cable guides[4] while descending, climbers must pull the cable away from the guides before passing them and then press the cable back into the guides after passing them:

---

[4]Typically, towers have cable guides intermittently positioned vertically along the side of the tower, which secure the cable against the tower. ECF No. 134 at 127; Trial Exhibit No. 45 at 04:20.



**Video Image of a climber demonstrating pulling the cable away from a cable guide (which is indicated by a red arrow) while descending a tower, from 3M's climbing demonstration video, Trial Exhibit No. 45 at 04:34[5]**

Teresko testified that, to ascend and descend the tower, the climber uses a cable grab device (in this case, the X3) for safety. ECF No. 129 at 39. Once at the client's carrier platform, where the climber performs assigned maintenance work on the tower, the climber attaches his lanyards to the platform and then either detaches from the cable grab device, or he keeps the cable grab device attached, but in the latter instance the lanyards "become [his] safety instead of the cable grab [device]." ECF No. 129 at 39. Lanyards must be 100% tied off[6] before the climber can detach the cable grab device. *Id.* at 40.

---

[5] The Court has superimposed arrows and circles in some of the images replicated in this Order for the reader's benefit.

[6] 100% tie off "means that at any one point in time, one of two lanyards of the worker must be secured to the anchor point." Ministry of Manpower, *Annex B – Fall Control Measures for Working at Height*, *available at* https://perma.cc/2VPG-T9DL (last visited Oct. 4, 2024); *see also* ECF No. 129 at 39 (Q: "[T]his clamp on the end of a lanyard, [is that what] you would tie into before you took off the X3 cable grabber?" A: "Absolutely.").

The X3's user instructions and warning label instruct and warn the user that he must never touch the device other than installing it onto the cable and removing it from the cable. ECF No. 134 at 126–27. The instructions repeat that the user must not "handle or move the sleeve from the carrier when passing cable guides or if the sleeve locks." *Id.* at 127. If a climber does come across a cable guide, to get past it, the instructions inform the climber to move the cable, rather than the X3 itself, in and out of the cable guide, as demonstrated in the screenshot above. *Id.* at 127–28; *see also supra* note 4. The warning on the device also reads: "Failure to heed warnings may result in serious injury or death." ECF No. 128 at 59.

## 2.2    X3 Predecessors

3M began selling the X3 to customers in the spring of 2016. ECF No. 133 at 110. The X3's predecessor was the X2, which 3M began selling to customers in the spring of 2014. *Id.* at 111. 3M has sold over 140,000 X2s and X3s between 2014 and 2020. ECF No. 134 at 128.

In August 2016, 3M recalled the original Lad-Saf, the X1, which at the time had complied with all applicable standards. ECF No. 133 at 119–20, 126. The X1 recall was due to "a limited number of incidents involving a serious injury or death in the United States while using the sleeve." *Id.* at 121. The "potential misuse scenarios" with the X1 involved "entanglement with cords, lanyards, clothing, or other materials[,] or grasping the sleeve prior to or during a fall[,] or result[ed] from the user attaching the sleeve upside down," which "ke[pt] the handle in the up position." *Id.* at 125–26. On the X1, there was only one braking mechanism—the mechanical brake—and panic grabs were able to occur before the mechanical brake grabbed onto the cable. *Id.* at 127, 133.

3M added a secondary locking mechanism to the X2—the inertial brake—to design out the foreseeable user inversion misuse as well as the "potentially" foreseeable misuse of lateral load to the handle from a panic grab. ECF No. 133 at 128; ECF No. 134 at 12–13, 37–38, 72, 81. Miller testified that "one of the purposes behind the redesign of the X2 and X3 . . . was to guard against overriding one locking mechanism." *Id.* at 48. Miller further testified that an X2 or X3 user cannot experience the same misuse issues that 3M discovered with the X1. *Id.* at 74.

3M uses a tracking system to monitor field complaints associated with its products. *Id.* at 71. 3M pulls products from the market, if necessary, when it is made aware of a product issue or quality issue. *Id.* Miller escalates issues to senior leadership when he learns of them, but he has not done so in this case because, as discussed further *infra*, he testified that the lateral load panic grab scenario is not possible. *Id.* at 72.

### 2.3    3M's X3 Testing and Locking Speed

The X3 passed all relevant American National Standards Institute ("ANSI") standards, the European standards, the Canadian standards, and the Occupational Safety and Health Administration ("OSHA") standards. ECF No. 133 at 116–17. Miller also testified extensively regarding 3M's efforts to replicate field conditions with its tests such as using "[s]and, oil, metal shavings, . . . freezing the device, dipping it in oil, corrosion," etc., to ensure that the device worked properly in the field, none of which is required by ANSI. ECF No. 134 at 86.

To comply with the pertinent ANSI standard, the X3 had to pass four tests: the dynamic performance test, the dynamic strength test, the static strength test, and the locking function test. *Id.* at 111. The locking function

test involves a zip tie around the body and underneath the arm of the device to disable one locking mechanism:



**Video Image depicting 3M's locking function test, with the zip tie delineated by a red circle, Trial Exhibit No. 610 at 00:05[7]**

*Id.* at 113. It is designed to simulate a panic grab before the fall occurs, "which may result in a panic grab keeping the lever up." ECF No. 136 at 104. The X3 passed the locking function test. *Id.* at 100–02. 3M's fall protection expert, Gregory Small ("Small"), testified that the X3 passed with a sleeve travel (i.e., the amount of distance the X3 travels on the cable before locking up) of both 3.25 inches and three-quarters of an inch. ECF No. 136 at 67–68, 100. Small testified that the X3 would lock in 0.06 seconds for sleeve travel at three-quarters of an inch. *Id.* at 102. For sleeve travel of two inches, the X3 would lock in 0.1 seconds. *Id.* at 101. For sleeve travel of 3.25

---

[7]In response to the jury's request during deliberations to review "3M's video of testing of [the] unmodified device," ECF No. 121 at 3, the parties agreed to play videos of 3M's locking function test and the dynamic performance test, as shown in the above and below screenshots. ECF No. 132 at 11; Trial Exhibit Nos. 581, 610.

inches, the X3 would lock in 0.13 seconds. *Id.* at 102. Small opines that the sleeve travel to lock up speed ratio is not "one-to-one"; "if you doubled the time, you're going to get four times the fall distance." *Id.* at 103.

The dynamic performance test, which attaches a steel weight to the quick release mechanism and then releases the weight, revealed that the X3 locks in less than a tenth of a second:



**Video Image depicting 3M's dynamic performance test, Trial Exhibit No. 581 at 00:09**

ECF No. 134 at 111, 117.

Miller defines a "panic grab" as "someone climbing, they experience a fall, they sense they have experienced this fall, and they move their hand into a position to grasp onto the [X3] such that this" lateral load to the handle "overrid[es] both locking mechanisms." ECF No. 133 at 98–99, 100. Small defines a panic grab as "a reaction of a user during a fall whereby they subconsciously grab structures and components in an attempt to arrest their fall once it is initiated." ECF No. 136 at 91. Miller agrees that a panic grab is not a conscious action, but rather a reflexive action when one

recognizes he is falling. ECF No. 134 at 6. Miller testified that 3M does not warn against reflexive or subconscious actions because "something that is reflexive and subconscious" is not preventable. *Id.* at 130–31.

3M hired a third-party group of engineers to provide an "unbiased opinion" and work with internal 3M engineers to conduct a risk assessment on the X2. *Id.* at 76–81. The third-party engineers investigated the X2 at their facility to identify potential hazards, while 3M engineers also independently investigated the X2 to identify potential hazards. *Id.* at 77–78. After doing this work separately, the third-party group of engineers and the 3M engineers came back together and identified 101 potential hazards with the X2, which included "[s]ome normal use, some potential misuse situations, corrosion, debris, [and] foreign material objects that [climbers] might be wearing on their harnesses." *Id.* at 78–79. The third-party group of engineers and the 3M engineers together categorized each hazard as high, medium, or low risk based on "what aspects of the existing design rule out th[e risk] as a possibility or limit that as a possibility" and the "severity of the failure mode and . . . how likely is something to happen." *Id.* at 79–80. 3M ultimately designed each initially high-risk hazard down to a low-risk hazard. *Id.* at 80.

As part of this risk assessment process, Miller and his team identified the "potential for a panic grab [with] a lateral load" to defeat both braking mechanisms. *Id.* at 82. Miller and his team then "spent a half day trying to figure out whether or not [panic grab with lateral load that defeats both braking mechanisms] was a real possibility." *Id.* Miller and three other engineers went to the 3M test lab, climbed a ladder, put their hands on the ladder, and then tried to jump off the ladder while moving their hands to a position that would override both locking mechanisms before the device

locked. *Id.* They tried with their hands down low, up high, far away from the cable, and close to the cable, but they could not create a situation even already "knowing what [they] were going to try to do with [their] hands." *Id.* at 82–83. Because they could not create the situation, they did not test it further. *Id.* at 84–85.

Miller also provided extensive testimony regarding his discussions with his team in 2012 about the possibility of adding a lateral load to the panic grab zip tie test (ostensibly, the locking function test). ECF No. 133 at 102–03. However, the group was unable to create such a scenario without manipulating the X3 in a way that would not be representative of how it is intended to be used. *Id.* at 103–04. The group had considered the possibility of lateral load being applied to the handle of the X3 in a panic grab but had designed this possibility out because the X3 "locks too fast for someone to be able to do that." *Id.* at 104; ECF No. 134 at 10. Specifically, Miller testified that "in a panic grab situation," it is "impossible to apply lateral load to the X3 device" thus demonstrating that 3M had "designed out the ability [for] someone to grasp onto it once they have fallen." ECF No. 134 at 10, 12, 25, 81; *see also* ECF No. 136 at 84–85 (Small's testimony that the X3 "is a safer device because it includes a feature to resist panic grab"). However, at no time between 2012 and 2020 did 3M run a test to try to quantify lateral load on an X3 or X2. ECF No. 134 at 12.

Thus, Miller ultimately testified that 3M designed out panic grab with the X2 and X3 because "the way people climb, the way they fall, the time that it takes for them to recognize what's going on and the time it takes for an X2 or X3 to lock, it's just not possible." *Id.* at 81. As a result, during the risk assessment, panic grab was lowered from a high-risk level to a low-risk level, and 3M did not include it on the risk level report because it was

not possible outside a misuse scenario and 3M "cannot force someone to use the safety device" correctly. *Id.* at 81, 84–85. Miller elaborated that 3M did not design out the hazard of lateral load to the handle before a fall begins, or while stationary on the ground in the courtroom as Plaintiffs' counsel demonstrated to him, because 3M considers that a misuse. ECF No. 133 at 115. Miller specifically testified that intentionally lifting the lever on the X3 and applying a lateral load is "a misuse situation" and contrary to the user instructions and warning label on the X3. ECF No. 134 at 12, 62–63. Holding the device as such in the courtroom is not representative of the way a worker would use the device or a real-world fall scenario. *Id.* at 63.

3M also conducted a Design Failure Mode and Effects Analysis ("DFMEA") on the X3, which is "essentially a second risk assessment on the design of the X3." ECF No. 134 at 18, 90. Miller led a team of 3M engineers to conduct and prepare a written summary of the DFMEA on the X3, and his team relied upon and looked at the risk assessment on the X2 as part of this process. *Id.* at 88–89. A DFMEA is "a systematic group of activities intended to recognize and evaluate potential failure of a product/process and the effects of that failure," to "identify actions that could eliminate or reduce the chance of the potential failure occurring," and to "document the process." *Id.* at 19. "To achieve the greatest value," a DFMEA "must be done before a product or process failure mode has been incorporated into the product or process." *Id.* at 20. A company should "try to design out all the failures [it] can at the design stage," but if it "find[s] out about things happening in the field, [it should] go back to the [D]FMEA and revisit [it] to see if things were missed." *Id.* at 21.

Miller testified that a lateral load on the X3 that negates both locking mechanisms would be a "ten severity" hazard in a DFMEA. ECF No. 133 at

Page 16 of 95

114. When a "ten severity" hazard is identified, the hierarchy of engineering design requires that the hazard be designed out. *Id.* at 115. However, again, Miller testified that 3M had designed out the panic grab scenario with the X2 and X3. ECF No. 134 at 76–85. Because this hazard mode was ruled out as a possibility given the X3's design (in other words, it was designed out), it was not included in 3M's DFMEA for either the X2 or the X3. ECF No. 133 at 104; ECF No. 134 at 23; ECF No. 136 at 17. Miller testified that "[3M] wouldn't document anything" that "can't occur" in a DFMEA. ECF No. 134 at 24.

Plaintiffs' expert in system safety, Gary Whitman ("Whitman"), agreed that "one approach" to designing out the hazard would be "to design the X3 to lock so fast a user couldn't grab it after a fall." ECF No. 136 at 13, 33. Whitman also generally agrees that if a manufacturer cannot design out the ability for a user to use a product a certain way, "all [the manufacturer] can do is warn against it." *Id.* at 34.

Whitman testified that 3M's failure to test the identified failure mode of lateral load to the X3 handle fell below the standard of care of a design engineer. *Id.* at 18. He also testified that if Miller had known about the hazard mode in 2012, 3M should have included it in the DFMEA. *Id.* Finally, he testified that 3M fell below the standard of care in following the design hierarchy. *Id.* at 26–27.

Whitman also testified that a fall is "a process that takes time to develop" and that during that time, "there's the potential and a reflex that [the person falling will] reach out and attempt to grab something to arrest

[the] fall." *Id.* at 25.[8] He spoke about this scenario as it applies to ladders ingress to an aircraft, not a cable grab attached to a monopole, though he testified that "the human response to the fall isn't going to be different" because "[i]t's the same reflex." *Id.* at 25, 32. Whitman opined that "there's no question there's enough time for a panic grab to occur before [a climber is] free falling." *Id.* at 43.

Small testified that, assuming that a worker didn't have his hands on the X3 at the moment that he fell, he could not panic grab in a way that would defeat the device because "[t]here's just not enough time" given that the body "has to recognize that [it's] falling, and it has to react," which takes time, while the X3 is designed to lock in "[t]he range of 0.1 of a second." *Id.* at 70; *see also id.* at 106. Small opined that simply squeezing the device would not defeat the device; rather, the user must have his hand on the device, lift the lever, and apply a lateral load on the handle, which Small considers an intentional misuse of the device. *Id.* at 70–71. Lifting the lever to apply lateral force further requires the user to "move [his] thumb back and push sideways on the lever." *Id.* at 94. Small ultimately opined that if the X3 "locks off in [0].1 of a second, either [the user's] hand is already on it at the time of the fall or it's going to be locked off before [the user] can get it there." *Id.* at 85. And if the user's hand is on the device prior to the fall, that is a misuse. *Id.*

_____

[8]Because Whitman is not an expert in biomechanics, the Court issued a limiting instruction that while Whitman "can provide some background generally on the subject [of perception reaction time]," the jury is "not to consider that testimony in the same manner that [it] might consider the testimony of someone truly qualified as an expert with respect to biomechanics." ECF No. 136 at 26, 30–31, 43.

The fastest perception reaction time (which is different from a reflex) of which Small is aware is 0.2 seconds, which derives from a study where participants waited for a light to turn on to hit a button. *Id.* at 127, 165–66. Perception reaction time involves consciousness, and Small agrees that humans' nervous systems react faster than humans can consciously think and thus that reflexes are faster than perception reaction time. *Id.* at 129, 144–45. Small agreed that it took Teresko 2.5 seconds to fall about a hundred feet, and he also agreed that a panic grab could last that long. *Id.* at 148.

However, Small has not seen any evidence that Teresko panic grabbed and laterally loaded the X3 while he was falling. *Id.* at 94. He explained that "[d]ue to how quickly the device locks off, a [panic grab with lateral load to the handle] would have to have been happening before he fell." *Id.* He further opined that when a climber is falling, he would not grab "[t]hings that are traveling with [him]," like his clothing, but rather, he would grab for stationary structures, particularly if his hand is already on a step bolt or peg "where [his] hands are to the side." *Id.* at 96, 107.

3M's human factors expert, Dr. Dennis Seal ("Dr. Seal"), defines a panic grab as "an uncontrollable reflex motion during an unexpected event," and he agrees that panic grab was designed out in the X2 and X3 through the addition of the secondary locking mechanism and the fact that the device locks in less than a tenth of a second. ECF No. 130 at 9, 23–24, 27, 28 ("[T]hat cannot humanly happen to grab that in less than a tenth of a second. It is the speed of actuation that is actually eliminating that risk."), 32. Dr. Seal opined that a bodily-type sensation of falling begins before a human starts to fall. *Id.* at 12. Like Small, he distinguished perceiving and reacting to a fall from involuntary reflexes, such as recoiling one's hand from a hot stove. *Id.* at 13. Dr. Seal has never seen a test where someone

Page 19 of 95

could react faster than 0.2 seconds. *Id.* at 16. He estimates that it would take 0.4 to 0.5 seconds for someone to perceive a fall. *Id.* at 37. It would take another quarter of a second for someone to react to the fall, making the fastest fall reaction time a total of 0.75 seconds. *Id.* at 37–38. Dr. Seal opined that this time would be slower if someone was wearing bulky clothing or big gloves. *Id.* at 38.

Dr. Seal conducted a time-motion analysis on the gestures needed to apply lateral load to the X3—grabbing the lever, squeezing it, twisting it, rotating it, and pushing it away from yourself—and opines that it cannot be done in less than a tenth of a second. *Id.* at 16–17. Dr. Seal cannot conceive of a way to manipulate the device that way unless it is done intentionally. *Id.* at 24. Dr. Seal agreed, however, that if a panic grab negates both locking mechanisms, it would violate the ANSI standard that requires "a second independent locking means . . . which cannot be disengaged or interfered with during a fall event by reflexively grabbing the carrier sleeve." *Id.* at 56.

Another test, the fallback test, is "predictive" of a fall where an individual's "upper torso begins the fall by falling away from the cable." ECF No. 134 at 25. It is "consistent with a climber who . . . loses the[ir] grip on a rung with an upper hand and senses their upper torso going rearward." *Id.* at 56. When an individual falls in this manner, the X3 moves up, which may go closer to the user's hand when it is above the sleeve. *Id.* at 25–26; ECF No. 136 at 168. While the inertial brake does not recognize this fall because there is no change in velocity, Miller testified that nonetheless "[t]he mechanical arm will lock." ECF No. 134 at 26; *see also id.* at 28, 122. The mechanical arm "has to come down . . . before it grabs the cable," which, depending on "cable type [or] cable material," may result in it grabbing the cable at different points: "sometimes it grabs the cable at half

Page 20 of 95

an inch and sometimes it grabs the cable in three and a half or four inches."
*Id.* at 29. Miller does not know "[h]ow much longer" it takes the mechanical
arm to grab the cable at these different points, though he testified that the
X3 can grab the cable after sleeve travel of three to four inches in "about a
10th of a second." *Id.* at 29–30. The X3 passed the fallback test. *Id.* at 122–23.

Under such a fallback scenario as described by Plaintiffs' counsel,
the climber has lost grip with his top hand. ECF No. 136 at 151. Before
anything else, he grabs his X3 and applies lateral load to a raised handle. *Id.*
at 151, 168. Then his feet leave, and the fall begins. *Id.* Small opined that, in
this scenario, he cannot conceive of a climber reacting by pushing his hand
in sideways and lifting the lever up and testified that, at best, the climber
might catch the cable. *Id.* at 151, 168–69. Small opined that this scenario is
not foreseeable. *Id.* at 169. Small could not say whether the X1 recall means
that 3M found that "panic grabs can occur with the mechanical braking
quicker than the [0].1 seconds that allegedly it would respond." *Id.* at 160.
Dr. Seal agreed that the X1 could be panic grabbed in enough time to negate
the mechanical break and agreed that if both brakes are negated, the X3
would be in the same position as the X1. ECF No. 130 at 66.

With respect to a prior incident involving the X3, the "Moore"
incident, 3M "attempted to do a root cause [analysis], but the employer was
not interested in [its] assistance." ECF No. 134 at 42. What 3M did learn in
the Moore incident was that the cable broke and the user "stated that the
device had locked onto the cable and worked with flying colors" and that
"his hands were not on the device." *Id.* at 103, 107. Small concluded that the
worker in the Moore incident experienced approximately one foot of free
fall before the device locked onto the cable. ECF No. 136 at 117–18.

As to another prior incident involving the X3, a "fast complaint" incident where an individual claimed to have fallen four feet before the X3 arrested the fall, 3M "provided some information back to the employer, but [the employer] didn't ask [3M] for any additional help," so 3M did not perform a root cause analysis. ECF No. 134 at 51–52. With respect to another incident involving the X3 where a customer claimed to have fallen ten feet before the X3 arrested the fall, 3M did not do a root cause analysis because it "asked [the customer] to send the device and system back to [3M]," but the customer had lost the equipment. *Id.* at 51–52. For both incidents, 3M determined that the users fell only one foot, which is within the ANSI standard: that the max sleeve travel be 20 inches. *Id.* at 110. Whitman is critical of 3M for not doing additional testing on the failure mode of lateral load to the X3 handle at these times and opines that 3M has not designed out the failure mode of lateral load to the X3 handle. ECF No. 136 at 19–20.

### 2.4 Modified X3 Design and Testing

Plaintiffs' engineering expert, Dr. Mark Russell ("Dr. Russell"), disagreed with 3M's position that panic grab with lateral load is impossible because it cannot happen quickly enough before the device locks. ECF No. 134 at 141, 152.

In June 2022, Dr. Russell inspected the cable from Teresko's fall. *Id.* at 153–54. Dr. Russell found the cable to be acceptable for use with an X3. *Id.* at 155. Dr. Russell also inspected the scene, but at that time, the area had changed and a satellite dish that had been at the tower was no longer there. *Id.* at 157. Dr. Russell does not know how many times Teresko used the X3 before the accident, how he transported it, or how he stored it. ECF No. 128 at 72. He did not investigate the gloves that Teresko was wearing while he was climbing because they were lost. *Id.* at 73–74.

Dr. Russell opines that the problem with the existing X3 design is that if one "appl[ies] a lateral force [to the] locking lever, that tends to rock the handle," underneath which is a "white washer," which in turn "impinge[s] on and . . . pinch[es] the cam such that it can't move." ECF No. 128 at 43. He reached this conclusion after assessing seven theories and ruling out six of them. ECF No. 134 at 159–60. He modified the X3 to "change the load path from the handle to the internal bushing of the handle to the white washer to the internal bushing cam arm to the back of the . . . unit." ECF No. 133 at 113. He did so by reducing the diameter of the white washer and isolating the white washer into the post rather than through the bushing of the cam arm. ECF No. 134 at 53–54; ECF No. 133 at 113; ECF No. 128 at 44–45. His modified design "adds a ridge to the pivot shaft," which "creates a gap that is .05 inches wide":



**Image depicting the ridge that Dr. Russell added to the pivot shaft (which is indicated by a red circle), Trial Exhibit No. 60 at 26**

ECF No. 128 at 91, 93. The modification took him 40 hours of work and cost approximately $200. *Id.* at 98–99.

Miller agrees that Dr. Russell's modification designs out the hazard mode of lateral load on the X3 handle negating both locking mechanisms,

as Plaintiffs' counsel demonstrated for Miller in the courtroom. ECF No. 133 at 114–16. Miller further testified that, assuming Teresko misused the X3 by touching it before he started to fall, Dr. Russell's modified design has designed out even this product misuse. *Id.* at 130.

Dr. Russell testified that he initially tested his modified device with "either two hands or actually one hand is practical, possible to do," to evaluate whether lateral force on the energy absorber would impinge the cam. ECF No. 134 at 160–61. Dr. Russell did not produce any photographs or testing related to a left-handed panic grab. ECF No. 128 at 70. Another method of testing that Dr. Russell did to his modified device involved bolting a "lateral force device" to the side of the X3's arm, which is not required by the ANSI standards or any other standards:



**Image depicting Dr. Russell's air cylinder lateral force device (indicated by a red arrow), which is used to apply lateral force to the energy absorber, Trial Exhibit No. 38 (and Dep. Exhibit No. 49)**

ECF No. 134 at 98–99, 162; ECF No. 136 at 109–10. Miller testified that this method of testing is "not how [the X3 is] intended to be used." ECF No. 134 at 100. The lateral force device uses an air cylinder to apply lateral force to

the energy absorber, as depicted in the image above. *Id.* at 164–65. Dr. Russell also tested his modified device using a zip tie to hold up the energy absorber. *Id.* at 162; ECF No. 136 at 109. 3M also conducts zip tie tests (again, ostensibly the locking function test), which it calls "panic grab tests," which are meant to isolate the inertial braking of the X3 away from the mechanical braking. ECF No. 134 at 163. Dr. Russell performed his tests in his engineering lab. *Id.* at 162. Small opines that Dr. Russell's tests simulate a misuse before the fall initiates, not a "reflexive grab" or a "subconscious grab," though he concedes that ANSI tests also model misuse. ECF No. 136 at 110, 135. Dr. Russell agrees that his testing replicated a misuse scenario. ECF No. 128 at 78.

Dr. Russell performed a drop test with lateral load, which caused him to opine that "lateral force on the energy absorber handle resulted in impingement of the locking cam and prevented it from moving into its locking position." *Id.* at 40–41. Dr. Russell examined the interior of the X3, and he concluded that the design defect was that lateral load on a raised handle negated both braking mechanisms. *Id.* at 41. Dr. Russell received one device he worked with already disassembled by a prior consultant in the case. *Id.* at 79–80.

After 3M criticized Dr. Russell's tests, an independent lab tested his modified device to the pertinent ANSI standard as well as using his lateral force air pressure device. *Id.* at 47. The independent lab's tests used a zip tie to hold the X3's handle and Dr. Russell's lateral force air pressure applied force to the handle before a weight was dropped:



**Video Image depicting the independent lab's weight drop test before the weight was dropped, with arrows pointing to Dr. Russell's air cylinder lateral force device and the zip tie, Trial Exhibit No. 50 at 00:02[9]**

ECF No. 129 at 84–85. The lab then dropped the weight:

---

[9]In response to the jury's request during deliberations to review "the video evidence of Dr. Russel[l]'s test of his modified device," ECF No. 121 at 3, the parties agreed to play the independent lab's testing videos, as shown in the above and below screenshots. ECF No. 132 at 11; Trial Exhibit Nos. 50, 51.



**Video Image depicting the independent lab's weight drop test after the weight was dropped, with arrows pointing to Dr. Russell's air cylinder lateral force device and the zip tie, Trial Exhibit No. 50 at 00:10**

Dr. Russell opines that his testing and the independent lab's testing show that a user's ability to "interfere[] with" a "second independent locking means" "by reflexively grabbing the carrier sleeve" means that the X3 violates the pertinent ANSI standard. *Id.* at 49–50. He opines that this violation was causal of Teresko's injuries. *Id.* at 50. Dr. Russell also opines that 3M fell below the standard of design engineering in failing to document any testing between 2012, when the failure mode was identified, and 2020, which was causal of Teresko's injuries. *Id.* at 50–51. Dr. Russell finally opines that the X3 as designed is defective and unreasonably dangerous, which was causal of Teresko's injuries. *Id.* at 51.

Dr. Russell did not analyze fall reflex or reaction time as part of his work on this case, and he did not investigate the pegs on the tower Teresko was climbing to determine "how long it would take somebody to reach either right or left hand from one of those pegs to the cable where the device would be connected." *Id.* at 60–61, 75. Dr. Russell also could not rule out that Teresko's equipment touched the X3. *Id.* at 57–58.

3M does not know whether Dr. Russell's modified design would prevent the lateral load cam locking issue when used in the field. ECF No. 134 at 101. It has not seen any documentation related to Dr. Russell's testing where Dr. Russell put his modified device "on a real tower in the field connected to a real user and was able to get the cam and the device not to work." *Id.* Dr. Russell testified that he "intentionally and deliberately grabbed the . . . X3" for his tests while on the ground in his office. ECF No. 128 at 70. Dr. Russell did not test his X3 with gloves like those Teresko was wearing on February 8, 2020. *Id.* at 74. Dr. Russell did not test his modified device with an amount of force above 28 or 29 pounds, and he does not know if there is an amount of force that might defeat even his modified design. *Id.* at 81–82. Neither Dr. Russell nor the independent lab performed any test where they "tried to apply lateral load *after* [they] release[d] that weight." *Id.* at 85–86 (emphasis added). Dr. Russell did not perform any testing to determine whether the new gap in his modified design could be affected by contaminants like sand or dirt. *Id.* at 93.

Small criticizes Dr. Russell's modified device and testing because the modification changed the weight of the device, which alters acceleration and balance, and Dr. Russell did not use a test mass. ECF No. 136 at 110–13. Small criticizes the testing done by the independent laboratory because the tests are not "identical" to those run on the unmodified X3, though he

concedes that the modified device would probably pass the ANSI standards. *Id.* at 115, 116 ("If you're going to claim that this doesn't work and this does, you've got to give them the same tests."), 145.

Miller has never heard a panic grab lateral load issue discussed at any ANSI committee meeting, and he has never discussed a panic grab lateral load issue with any industry manufacturers or labor organizations. ECF No. 134 at 129. Dr. Russell has never attended an ANSI meeting or relayed his theories to ANSI or OSHA. ECF No. 128 at 62–63. Small, who serves on the ANSI committee, has never heard any discussion with respect to the potential of panic grab and lateral load on the X3 or any cable grab. ECF No. 136 at 78, 80. Small testified that with respect to Canadian standards, there are no "reports of panic grab," "let alone panic grab with some sort of lateral load," so committee members did not feel that it needed to be in the Canadian standards. *Id.* at 104–05.

### 2.5 Teresko's X3 Use and the February 8, 2020 Fall

Nomedas Teresko ("Nomedas"), Teresko's brother, owns Nomad. ECF No. 133 at 64–65; ECF No. 129 at 107. Teresko testified that Nomedas told him never to touch the X3 while climbing, and Teresko's training materials reflect that instruction. ECF No. 129 at 63; ECF No. 128 at 94. Nomedas testified that he trained employees to always maintain three points of contact. ECF No. 129 at 120. However, Nomedas also testified that Nomad did not provide fall protection training to its employees. *Id.* at 126. Dr. Seal testified that he saw no evidence of training from Nomad and that the employee himself—Teresko—is responsible for his own actions in addition to Nomad. ECF No. 130 at 29, 41. Small has not seen any evidence that Teresko was trained on the identification of fall hazards on monopole towers. ECF No. 136 at 82–83.

Nomedas testified that, as the employer, he is responsible for Teresko's safety and has certain obligations under OSHA to make sure that Teresko is trained and using safe equipment. ECF No. 129 at 123, 125. Nomedas testified that, at all times while climbing and working on the tower, it is important to maintain focus on the task at hand, an assertion with which Teresko agrees. *Id.* at 127, 119–20.

Teresko testified that he knew before February 8, 2020, based on his review of the instructions and warning label, that he should never touch the X3 while climbing. ECF No. 129 at 62. He also knew not to touch the X3 while encountering a cable guide on the climb or if it inadvertently locked. *Id.* Small inspected the X3 Teresko was using on February 8, 2020, and found it to be functioning properly. ECF No. 136 at 87. The subject X3 is shown below:



**Image depicting the X3 that Teresko used on February 8, 2020, Trial Exhibit No. 25**

Teresko always completed pre-climbing inspection sheets before he climbed, and he did so on February 8, 2020, the day of the fall. ECF No. 129 at 28–29. The sheets required the climber to inspect the site, tower, everything on the ground, gear, and tools. *Id.* at 29. Teresko also always

completed a job hazard analysis form and did so on February 8, 2020, which requires inspecting the structure, fall protection lifeline, safety climbing gear, and tools. *Id.* at 30. Before a project, weather also plays a role, and climbers typically do not climb when the wind is above 15 miles per hour. *Id.* at 104–05. Climbers also do not climb when it is too hot or too cold. *Id.* at 105. Teresko testified that weather conditions can be recorded in the job hazard analysis form. *Id.* Teresko considers himself a "safety freak." *Id.* In the six years he climbed towers before the fall, which included hundreds of towers, he never lost his grip and needed his cable grabber to grab onto the cable. *Id.* at 41.

Teresko always brought a couple pairs of gloves while climbing in case one set got wet, or he would sometimes use one set of gloves for climbing only and others for working. *Id.* at 35–36. He had at least two sets of gloves when he climbed on February 8, 2020. *Id.* He used a pair of "thicker ski gloves" for climbing and a pair of "Dewalt gloves" to work on the carrier platforms. *Id.* at 76.

For the February 8, 2020 job, the client required Teresko to take a photograph showing completion of sector one of the tower. *Id.* at 33–34. There is a custom or practice when the climber is standing on a carrier platform on the tower to take a photograph showing that all interference is being removed ("PIM hygiene" work[10]), which the client required Teresko

---

[10] "PIM" stands for "passive intermodulation." RCR Wireless News, *PIM explained: passive intermodulation*, *available at* https://perma.cc/2LUX-49FT (last visited Oct. 4, 2024). It is "a form of signal interference, and it can be caused either by metal components or by two or more carriers sharing the same downlink path in a wireless network." *Id.* "Antennas, cables, and dirty or loose connectors can be sources of PIM, and so can damaged RF equipment or metal objects near or at a distance from the cell cite." *Id.* "PIM hygiene includes actions such as site clean-up. Crews can replace components with poor PIM performance with alternative

to do on February 8, 2020, as well. *Id.* at 21–22, 34–35. Teresko took these photographs during the job on February 8, 2020, with the Nomad company camera. *Id.* at 36. In the photograph of sector one, Teresko was wearing the Dewalt gloves and pointing:



**Image with a date stamp of 02/08/2020 and a time stamp of 17:11:44 showing Teresko pointing to sector one while wearing the Dewalt gloves, Trial Exhibit No. 18 at 1**

*Id.* at 77. The date stamp and timestamp on the photograph show February 8, 2020, at 17:11:44. ECF No. 129 at 78; Trial Exhibit No. 18 at 1.

The next photograph, which depicts the completed "PIM hygiene" work, has a timestamp of 17:15:52 and shows a support structure right under Teresko's feet as well as another employee—Mantas Navickis, discussed *infra*—on the platform below Teresko:

---

options: low PIM unistruts, straps, support brackets[,] and other hardware." ConcealFab, *Passive Intermodulation (PIM) Mitigation*, *available at* https://perma.cc/2JRR-5L8E (last visited Oct. 4, 2024).



**Image depicting a date stamp of 02/08/2020 and a time stamp of 17:15:52 and showing Teresko standing above a support structure and Mantas Navickis (whose helmet is circled in red) underneath Teresko, Trial Exhibit No. 18 at 2**

ECF No. 129 at 82; *see also id.* at 34 ("In this [picture], we are showing that all interference is being removed . . . [and] replaced with the zip ties . . . . All the cables were being secured, the interference removed, and they secured with the zip ties instead of metal holders.").

A third photograph, which shows Teresko pointing to sector one but wearing the ski gloves instead of the Dewalt gloves, has a timestamp of 17:28:20:



**Image with a date stamp of 02/08/2020 and a time stamp of 17:28:20 showing Teresko pointing to sector one while wearing the ski gloves, Trial Exhibit No. 18 at 3**

ECF No. 129 at 35, 83. The support structure is visible on the right side of this picture. *Id.* at 83; Trial Exhibit No. 18 at 3.

Teresko testified that clients required date stamps, but not timestamps; timestamps were "left and not adjusted." ECF No. 129 at 36. He would check to make sure the date stamps were accurate but not the timestamps. *Id.* at 79. Teresko testified that there was no indication that the timestamps reflect the time the photographs were taken and that he did not update the camera's time setting on a normal basis. *Id.* at 37. He thought the timestamps looked like computer-added timestamps. *Id.* at 37, 81.

Teresko has no memory of the fall and does not remember taking the photographs. *Id.* at 38, 43. The last thing he remembers before waking up in the hospital is arriving at the scene of the communications tower. *Id.* at 43. He has no memory of where he was on the tower when he fell, where his hands and feet were, why he fell, whether he touched his X3, or what noises he heard. *Id.* at 64–65, 67. His practice when taking photographs from the

tower, however, was to take them standing on the carrier platform secured with lanyards. *Id.* at 38. He testified that it is impossible to take photographs while hanging off the cable. *Id.*

Another employee of Nomad, Mantas Navickis ("Navickis") was working with Teresko on the tower on February 8, 2020. ECF No. 133 at 63, 65, 67, 73–74. Navickis received one day of training from Teresko and Nomedas on his first day with Nomad. *Id.* at 85. Prior to the accident, Navickis had climbed approximately five towers with Teresko, with Teresko acting as the lead climber. *Id.* at 68–69. Navickis observed that safety was Teresko's priority. *Id.* at 69. Teresko consistently reiterated that from the ladder at the bottom of the tower all the way to the top, climbers should always be hooked onto the tower. *Id.* Teresko also trained Navickis not to touch the X3 while climbing and always made sure Navickis followed that advice. *Id.*; ECF No. 129 at 63–64. Navickis is himself aware that the X3 has a warning saying not to touch it, and that if he touched it while he was climbing, it might not work. ECF No. 133 at 83–84. Navickis never saw Teresko touch his X3 while climbing, and Teresko testified that touching the X3 "is something [he would] not do naturally." *Id.* at 70; ECF No. 129 at 67.

Each time Navickis climbed with Teresko, he observed Teresko inspecting his X3 before he climbed. ECF No. 133 at 70. Teresko testified that his practice was to inspect the device before climbing, which included ensuring that the mechanical arm was working and putting all his weight on the X3 to ensure that it works. ECF No. 129 at 68, 69–70. Although Teresko trained Navickis to test the X3 before ascending, he did not train him to do so before descending. ECF No. 133 at 85–86. Navickis testified that it would surprise him to learn that Teresko believes that testing the X3

before descending is important. *Id.* at 86. Teresko testified that after climbing to the top of the tower, performing work, and reconnecting the X3 to the cable to climb down, it was his practice to test the X3 again by putting his weight against it before descending. ECF No. 129 at 70.

The communications tower that Teresko was climbing on February 8, 2020, had pins running vertically up its side, which climbers used to climb the tower:



**Image depicting the subject tower during Dr. Russell's investigation of the scene in June 2022, Trial Exhibit No. 59 at 137**

ECF No. 133 at 73. It also had cable guides holding the cable against the tower. ECF No. 134 at 127; *see also* Video Image *supra* page 9. The climbers used a ladder at the base of the tower to get up to the lowest pins. ECF No. 133 at 73–74. The lowest pins were eight feet from the ground. *Id.* at 74. The cable system was approximately 12 feet off the ground. ECF No. 129 at 68. The "lowest part of the tower" was a radio dish. ECF No. 133 at 78–79. 3M agrees that Teresko had the X3 properly attached to the cable on February 8, 2020, and that the cable was the appropriate size and material. *Id.* at 106–07.

Teresko is aware that, under OSHA regulations, when a climber is working above six feet, he needs to use fall protection. ECF No. 129 at 69. He did not use fall protection other than the ladder to climb the ladder to the climbing pins and cable system. *Id.*

When he climbed the tower, Teresko had lanyards, a work positioning device, and his tool bucket attached to him. *Id.* at 65, 66. He also had a strap with a screwdriver connected, and he testified that to work on the tower, he had to bring his tools all the way up to the carrier platform and all the way back down. *Id.* at 65–66. The tools must be attached to his body. *Id.* at 66. He does not recall where any of this equipment was in relation to the X3 when he fell. *Id.* His work positioning device was used to carry heavy equipment while working on the platform. *Id.* at 73–74. He had duct-taped the carabiner on the work positioning device so that it remained open:



**Image depicting Teresko's work positioning device, which 3M held up demonstratively during trial without objection from Plaintiffs, ECF No. 129 at 72–73; ECF No. 123-1 at 18 (citing ECF No. 116 at 17)**

Nomedas agreed that the carabiner should not be taped open and that it should not be used for work positioning. ECF No. 129 at 122. Small testified that the taped-open carabiner is not safe for any purpose and that its use

Page 37 of 95

indicates somebody who may "consciously . . . have taken other shortcuts." ECF No. 136 at 90, 154–55. Dr. Seal agreed that safety equipment should never be modified. ECF No. 130 at 42.

Navickis saw Teresko falling from the tower, but he did not see the fall begin or where Teresko's hands and feet were when the fall began. ECF No. 133 at 74, 89–90. He believes that before Teresko fell, he was "stationed, probably resting." *Id.* at 90. Teresko testified that sometimes while climbing he would need to take a rest using his lanyards. ECF No. 129 at 71. While resting on the tower, he would hold onto the tower and maintain three points of contact. *Id.* at 72. He would also maintain at least three points of contact while working on a carrier platform. *Id.* at 72. At times, he rested using his work positioning device with the taped-open carabiner, but he was always also attached with his lanyards "and secure." *Id.* at 73, 102. Small testified that lanyards can potentially create a fall hazard for workers. ECF No. 136 at 90. Dr. Seal testified that a taped-open carabiner should not be used to rest. ECF No. 130 at 42.

Navickis was alerted to the fall because he heard "[a] zip line sound." ECF No. 133 at 74. Navickis was removing his equipment after having descended the tower, and he testified that "ten seconds maximum" passed between the last time he saw Teresko "having no problem" and the zip line sound. *Id.* at 77–78. Navickis had ascended and descended the tower using his X3 with no trouble. *Id.* at 84. When Navickis last saw Teresko before the fall Teresko was at the radio dish, and when Navickis heard the zip line sound, Teresko was "somewhere like halfway down." *Id.* at 78–79. Navickis heard the zip sound all the way down, and he believes that Teresko fell "somewhere around . . . th[e] radio dish." *Id.* at 79. Navickis saw that the

X3 was hooked to the cable while Teresko was falling, and he did not see Teresko's arm in front of the X3 or his hand blocking the X3. *Id.* at 91–92.

Navickis conceded that he testified at his deposition that he thought he saw Teresko "trying to grab onto anything" as he fell. *Id.* at 92–93. Navickis believes Teresko was trying to grab onto something because if Navickis was falling, that's what he would do. *Id.* at 93. However, Navickis never saw Teresko actually grab onto something or get his hands on the pegs to stop his fall. *Id.* at 93–94. He did not see Teresko grab the cable or the X3. *Id.* at 94. Navickis called 911 to the scene at 4:30 PM, and Teresko was checked in to the hospital at 5:22 PM. *Id.* at 80; ECF No. 129 at 78.

At the time that Navickis heard the zip line sound, no witness in this case knows where Teresko's hands were, where his feet were, why he fell, how he fell, what pegs he was at on the communications tower, or where his equipment was. ECF No. 128 at 55–56; ECF No. 129 at 38, 43, 127–28; ECF No. 135 at 52; ECF No. 136 at 28, 87–88; ECF No. 130 at 26. It is suspected that Teresko most likely fell while descending. ECF No. 136 at 148–49.

Navickis estimated that Teresko fell over one hundred feet. ECF No. 133 at 79. Dr. Russell inspected the bracketry to which the bottom of the cable was attached and found that it was taken with great force off the tower. ECF No. 134 at 156. That inspection, together with his inspection of the scene, caused him to estimate that Teresko fell about 88 feet and "broke through the bracketry near the bottom of the cable." *Id.* at 156–57.

3M was never provided timely notice of Teresko's fall to investigate the facts and determine what may have occurred. ECF No. 134 at 104–05. Nomad did not reach out to 3M about the fall. *Id.* at 105; ECF No. 129 at 129. Nomedas testified that neither he nor Nomad ever tried to determine the

root cause of the fall. ECF No. 129 at 128–29. Plaintiffs' lawyers did not reach out to 3M about the fall until the filing of the instant lawsuit. ECF No. 134 at 105. Nomedas testified that he asked Plaintiffs' lawyers about contacting 3M, but that Plaintiffs' lawyers never told him to contact 3M. ECF No. 129 at 134–35.

According to Miller, when an investigation is delayed, equipment can get lost, things can change depending on how they are stored, and witnesses' memories may fade. ECF No. 134 at 106. Small opined that it is not possible to develop a root cause analysis if there is missing information regarding how the worker fell, why he fell, where he was positioned, where his hands were, where his feet were, and where the equipment was in relation to the X3. ECF No. 136 at 164.

3M has not seen any investigation report of Teresko's incident prepared by Nomad. ECF No. 134 at 106. Nomad asked OSHA to do an investigation, and an OSHA investigation report was prepared, which concluded that Nomad had done nothing wrong. *Id.* at 149; ECF No. 129 at 129–30, 135–36. OSHA did not cite Nomad. ECF No. 130 at 50. The OSHA report did not conclude that the X3 was defective. ECF No. 136 at 72.

### 2.6    Injuries

Dr. Gregory Schmeling ("Dr. Schmeling"), an orthopedic trauma surgeon, was Teresko's treating surgeon after his fall. ECF No. 128 at 5, 8. Teresko suffered a "truly emergent injury involving a disruption of the blood flow to his left arm as a result of the fall." *Id.* at 9. He also had significant soft-tissue damage. *Id.* The bone, soft-tissue, and blood vessel in his arm were repaired in surgery. *Id.* External fixators, which are frames outside the body, were placed across Teresko's left ankle for a Pilon fracture and right leg to stabilize a femur fracture. *Id.* at 9–10, 25. Teresko also

suffered an acute kidney injury due to the amount of muscle necrosis. *Id.* at 10. Teresko had rib fractures on the left side, a concussion, and a small pneumothorax. *Id.* at 11.

Dr. Sarah Sasor ("Dr. Sasor"), a plastic and reconstructive surgeon, also treated Teresko for his left arm injuries. ECF No. 135 at 9, 12. There was an injury to the brachial artery that was preventing blood flow. *Id.* at 13, 16. The arm was without blood supply for approximately six hours and Dr. Sasor was concerned that Teresko could lose his arm. *Id.* at 18. A vein graft from Teresko's left thigh was used to repair the brachial artery and restore blood flow. *Id.* Dr. Sasor also performed fasciotomies on the left arm to allow the muscles room to swell. *Id.* at 18–19. Some of the wounds were closed a few days later, on February 13. *Id.* at 24. Skin grafting was used on other wounds on February 17 using cadaver skin and skin from Teresko's thigh. *Id.* 26–27, 29. Dr. Sasor opines that Teresko has permanent damage to his left arm muscles. *Id.* at 20. Dr. Sasor also treated nerve injuries in the left arm, which have partially recovered over time and with therapy, though she opines that they will never fully recover. *Id.* at 31–33, 34.

Teresko experienced pain throughout his entire body when he woke up and would scream for medicine because he couldn't take the pain. ECF No. 129 at 44. Teresko was discharged from the hospital 21 days after the fall with "only one good limb." ECF No. 128 at 32, 105, 107. The many surgical incisions that Teresko suffered resulted in permanent scarring. *Id.* at 22, 28–29. Dr. Schmeling opines that Teresko will develop severe post–traumatic arthritis in his ankle due to the Pilon fracture and has already seen evidence of such arthritis in an x-ray. *Id.* at 25, 28. This condition will require surgery in the future. *Id.* at 26.

Dr. Schmeling continued to treat Teresko after he was discharged from the hospital. *Id.* at 23. Teresko worked hard in therapy, but he struggled with PTSD and depression. *Id.* at 24. Although Teresko is a smoker, his fractures "went on to heal," so Dr. Schmeling did not counsel him not to smoke. *Id.* at 36–37, 40.

Dr. Brad Grunert ("Dr. Grunert") is a psychologist and professor in the field of plastic surgery. ECF No. 135 at 47. Dr. Grunert evaluated Teresko one time for an hour via Zoom in February 2023. *Id.* at 49, 63, 141. Dr. Grunert opines that Teresko has severe psychological injuries due to the fall. *Id.* at 50, 63. Teresko developed disrupted sleep and nightmares, which he can have about the fall without remembering it because these functions process through different parts of the brain. *Id.* at 52, 56. He has, over time, developed severe avoidance of triggers, such as seeing his work clothes and looking at his scars. *Id.* at 53. He also has difficulty with short-term memory and concentration attributable to PTSD. *Id.* He has become isolated with episodic depression and has engaged in substance abuse to cope with PTSD. *Id.* at 54.

At the time that Dr. Grunert evaluated Teresko, Dr. Grunert believed the depression was moderate; he does not think that Teresko is ever depression free, but rather that his condition ebbs and flows. *Id.* at 60, 63, 75. Although Teresko has now established care with an outpatient psychologist, is receiving good treatment, and has improved, Dr. Grunert believes that Teresko's psychological conditions are permanent, even with medication and treatment. *Id.* at 61–62, 64, 75.[11]

---

[11] With respect to falling, Dr. Grunert testified that "intense feelings" related to a fall "would not" begin "as the body is sensing th[e] loss of equilibrium or as it's slipping before the actual fall or descent begins." *Id.* at 51–52.

Plaintiffs modified their home after Teresko was discharged from the hospital with ramps, a hospital bed, a portable shower, and a portable toilet. ECF No. 128 at 108. They also hired a nurse to care for Teresko a few times each week. *Id.* at 109. Teresko had frequent nightmares about his fall that woke him up. *Id.* at 111–12; ECF No. 129 at 57. Ms. Teresko had to assist Teresko with showering, using the toilet, dressing, and "everything" around the house. ECF No. 128 at 108–09. Teresko's first shower was approximately four months after the fall. ECF No. 129 at 46. Ms. Teresko had to use boards to slide Teresko from the wheelchair to the toilet or to the bed. *Id.* Teresko was "given the impression that [he] might never walk again." *Id.* at 47. But because he is stubborn, he worked hard in therapy and was able to walk again about seven to nine months after the fall. *Id.*

Teresko was prescribed OxyContin when he was discharged from the hospital. ECF No. 128 at 101. This was the first time he had been prescribed opioids, and he became addicted to them. ECF No. 129 at 47. Teresko also suffered from alcohol abuse and cocaine use after the fall, though he testified that he struggled with addiction issues before the fall as well. *Id.* at 86, 87.

Ms. Teresko explains that the fall and the subsequent opioid addiction made Teresko a "totally different person." ECF No. 128 at 113. Teresko agrees. ECF No. 129 at 47. He ended up checking himself into the hospital in August 2020 to try to get off the opioids. *Id.* At that time, he was also involuntarily admitted to a "psych unit." *Id.* at 48. Teresko had said that he didn't want to live and that he might kill himself, which was caused by his "los[s] [of] hope that . . . [he] might be normal again." *Id.* Before February 8, 2020, Teresko had never been admitted to a psych unit. *Id.*

In December 2020, Plaintiffs' marriage fell apart. *Id.* at 49. They separated and ultimately divorced in 2021. *Id.* At one point, because Teresko had lost all hope and didn't see the point of being alive, he discharged a gun into a wall. *Id.* Although he legally owned his firearm, his admission into the psych unit had, unbeknownst to him, cancelled his permits, so he was charged with a felony. *Id.* at 50. Because of the felony charge, Teresko performed community service at church and with an animal shelter. *Id.* At the church, he opened doors, cleaned what he could, and picked up garbage. *Id.* at 51. At the animal shelter, he washed dishes. *Id.* At some point, before he had completed half of his community service hours, Teresko went back before the judge and provided doctors' letters listing his restrictions, and he was let off. *Id.* at 51, 84. The community service work was too physically taxing for him. *Id.* at 51.

### 2.7 Residual Functional Capacity and Earning Capacity

Teresko has a bachelor's degree in business management and administration. *Id.* at 14. He later received a certification for climbing. *Id.* After marrying Ms. Teresko, he started working in visual communications. *Id.* at 15–16. In this role, he prepared projects and designs for zoning approval, which included images and photographs of how areas looked "with antennas and such when installed." *Id.* at 16. He later took classes to learn how to do computer-aided design ("C.A.D.") drawings. *Id.* He also had two years of graphics communications studies. ECF No. 135 at 126. During his career, he has earned many certifications and has consistently worked to improve himself because he loved working. ECF No. 129 at 16, 25–28, 37. Teresko also speaks four languages. *Id.* at 99–100. He hoped to stay in the workforce forever. *Id.* at 38.

After working for two years in visual communications, Teresko decided to try to build his own business in telecommunications. *Id.* at 16–17. He formed Universal Tower in 2014, which did projects including removing interference for cellular towers (otherwise known as "PIM hygiene," *see supra* note 10), cleaning towers, mappings, and construction. *Id.* at 17. Universal Tower also had a logistics component that included trucking. *Id.* Teresko took care of the trucks, attained contracts, hired and fired, and eventually obtained office space for Universal Tower. *Id.* at 20, 98–99. Universal Tower had years during which it would earn over $400,000, but Teresko did not take home much profit—usually less than $20,000—because expenses were high. *Id.* at 18–19, 91.

Nomad was doing better financially than Universal Tower and Nomedas had better connections than Teresko, which is why Teresko decided in 2019 to leave Universal Tower and work with Nomad. *Id.* at 18. Teresko signed a contract and began working with Nomad on January 2, 2020, as a climber. *Id.* at 19.

In the one month that Teresko was working for Nomad before the fall, he made $20,000, which is corroborated by a 2020 W-2 and Teresko's tax returns. *Id.* at 21, 59, 92. Teresko was paid mostly per tower or project that he worked on. *Id.* at 22. Nomedas testified that Teresko would pay him some percent of his earnings per job, sometimes up to 50% and sometimes just 30%, depending on the job. *Id.* at 115–16. Teresko was also responsible for paying workers in his crew, such as Navickis, for jobs they did with him, and for paying taxes. *Id.* at 117, 132. "PIM hygiene" work, or removing cellular interference, *see supra* note 10, paid less than construction work, and Teresko and Nomedas testified that climbers could earn $20,000 to $40,000 in construction work in two-weeks' time. *Id.* at 23, 113. During the one

Page 45 of 95

month that Teresko worked for Nomad, he primarily did "PIM hygiene" work. *Id.* at 21.

When Teresko joined Nomad, there was a belief that he should be able to make the type of money that Nomedas made in the years before 2020. *Id.* at 112. After reviewing his company tax returns, Nomedas verified that Nomad made $348,000 climbing towers in 2018. *Id.* at 112, 134. However, Nomedas also testified that there were times that Nomad was slow and that it was unclear how much work Teresko would get in 2020. *Id.* at 132–33.

Leanne Panizich ("Panizich"),[12] 3M's vocational expert, reviewed wage data to determine how much operations technicians can earn doing cell tower work. ECF No. 136 at 47, 54. Panizich also reviewed Teresko's 2020 W-2 and determined that although it did not provide her "with any information concerning the length of time for his payment, [number] of hours worked, et cetera," she did take it into consideration. *Id.* at 57. She also considered Teresko's deposition testimony that Nomedas took a portion of his pay and that he needed to pay his crew with what he earned, noting that there were a lot of "unknowns" as to those figures. *Id.* at 60–61. Her ultimate opinion is that Teresko's pre-injury earning capacity was $57,470 and that he was unemployed for approximately 101 weeks. *Id.* at 61–62.

Dr. Schmeling released Teresko to seated work in September 2020 and noted that when he saw Teresko in December 2020, he did not appear to have experienced any setbacks. ECF No. 128 at 37. Dr. Schmeling opines

---

[12] Panizich was unavailable to testify at trial and so Plaintiffs read portions of her deposition testimony into the record. ECF No. 136 at 47.

that Teresko's femur is now "pretty close to normal," though there are "some things he couldn't do." *Id.* at 26. Dr. Schmeling does not believe that Teresko has the strength or endurance to safely resume climbing towers. *Id.* at 30. Dr. Schmeling believes, however, that Teresko could "sit at a desk and participate in some kind of work," though he would need frequent breaks to stretch his limbs. *Id.*

Dr. Sasor opines that Teresko has permanent significant scarring, as well as permanent decreased sensation in the arm and hand, chronic pain, and difficulty with stiffness, range of motion, and strength in his hand and arm. ECF No. 135 at 34. She testified that Teresko declined a procedure that could have reduced his scarring. *Id.* at 44. A January 2022 functional capacity evaluation shows that Teresko has weight restrictions on his left arm and a recommendation for limited repetitive movements or movements requiring coordination. *Id.* at 38–39, 40. Dr. Sasor believes that Teresko would be permanently restricted from climbing work, but that he could work with restrictions as to his left arm. *Id.* at 42, 118.

Dr. Grunert would restrict Teresko from working at heights. *Id.* at 64. He also opines that Teresko would not be able to maintain focus for more than four hours at a time, and even then, he would not be able to work four-hour days consistently and would miss several days of work per month. *Id.* at 64, 65.

An August 2021 note from Teresko's treating psychologist states that "[t]he PTSD symptoms . . . have now largely abated" and that as Teresko engages in psychotherapy and recovery and "eventually resumes working," his prognosis is good. ECF No. 135 at 139. Navickis last saw Teresko in early 2023 and observed that he was walking and that his mood

was "basically regular old Rytis." ECF No. 133 at 83. Navickis thought Teresko was doing "amazing." *Id.*

From August 2022 through August 2023, Teresko applied to approximately one hundred jobs. ECF No. 129 at 52. He disclosed on his applications that he had a disability, and he did not receive any offers. *Id.* The applications also required Teresko to disclose his felony charge. *Id.* at 93. He no longer feels physically and mentally capable of work, though he is not going to give up on working "with restrictions and limitations" and wants to come to some kind of normality again. *Id.* at 52, 92.

Teresko still attempts to run to feel the pleasure of being "healthy [and] strong," and he has participated in a couple of races since February 8, 2020. *Id.* at 53, 102. The races, however, cause him a lot of pain, and he senses that his ankle is getting worse and will eventually need surgery. *Id.* at 53.

Teresko constantly feels pain and is unable to sleep normally. *Id.* at 54. He often goes without sleep for two or three days at a time and then sleeps for two or three days at a time. *Id.* He has problems with balance and vertigo and has fallen down the steps at his home, fallen off a step ladder, and fallen off the sidewalk. *Id.* at 55. In February 2023, Teresko stepped awkwardly off a curb and broke his right ankle, and in February 2024, Teresko fell down some stairs in his garage and broke something in his right wrist and his nose. *Id.* at 85–86. He has also injured himself preparing food. *Id.* at 55. And in October 2021, Teresko was involved in a car accident and broke his left wrist. *Id.* at 84.

Michele Albers ("Albers"), a vocational consultant and life care planner, evaluated Teresko's residual earning capacity and prepared a life care plan. ECF No. 135 at 81, 83. Albers opined that Teresko does not have any transferable skills because the skills from his former occupation do not

transfer well into other occupations, though she testified that she was unaware of Teresko's background studies in graphics communications. *Id.* at 87, 126. Albers also testified that vocational training is not an option for Teresko because he is only likely to succeed in hands-on training for physical jobs that he cannot perform. *Id.* at 92. She stated that vocational rehabilitation is also not an option for Teresko due to his physical and mental limitations. *Id.* at 93. She ultimately opined that Teresko "no longer has access to the labor market" and that he is "no longer employable; and, thus, he has no earning capacity." *Id.* at 95.

Teresko testified that he has tried to mow the lawn, but due to the difficulty, he hired mowers. ECF No. 129 at 56. For any task that requires two arms, he has had to adapt. *Id.* He can shower and stands while he showers, but he nevertheless benefits from a shower chair and bench. ECF No. 135 at 128. He struggles to dress himself and must sit down to do so. ECF No. 129 at 55.

Albers prepared a life care plan for Teresko listing items that he will require in his daily life, the cost for the items, and where he can obtain them. ECF No. 135 at 96–97. The items include an adaptive cutting board, a button zipper assist, a shower chair, home care, future surgeries, and medications. *Id.* at 99, 100, 104, 107, 110–13. The total cost of these items is between $381,732.36 and $462,975.17. *Id.* at 114. With respect to medications, Albers largely relied on Teresko's description of what he was taking and not on medical records. *Id.* at 135–36. She conceded that Teresko's felony conviction could be part of why he was not getting hired. *Id.* at 146.

## 3.     PLAINTIFFS' RULE 59(a) MOTION FOR A NEW TRIAL

### 3.1     Legal Standard

Rule 59(a) provides that the Court "may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). This is generally accepted to mean that the Court "may only order a new trial if the jury's verdict is against the manifest weight of the evidence, . . . or if for other reasons the trial was not fair to the moving party." *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (quoting *Marcus & Millichap Inv. Servs. v. Sekulovski*, 639 F.3d 301, 313 (7th Cir. 2011) and *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010)) (internal quotation marks omitted).

"In passing on a motion for a new trial, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook County*, 650 F.3d 631, 633 (7th Cir. 2011) (citing *Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 540 (1958), *United States v. Washington*, 184 F.3d 653, 658 (7th Cir. 1999), and *Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 798 (7th Cir. 1989)). The Court does not view the evidence in the light most favorable to either party; it instead makes "its own assessment of the evidence presented" and grants a motion for a new trial when it believes "that the verdict went against the manifest weight" of that evidence. *Id.* at 634 (citing *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 424 (7th Cir. 2000)).

Case 2:22-cv-01532-JPS     Filed 10/04/24     Page 50 of 95     Document 143

### 3.2 Analysis[13]

Plaintiffs move for a new trial under Rule 59. Fed. R. Civ. P. 59(a)(1)(A); ECF No. 123. Plaintiffs argue that they are entitled to a new trial because: (1) the Court erred in failing to properly instruct the jury as to the law governing Teresko's alleged negligence; (2) the Court erred by allowing 3M to argue that panic grab was causal negligence; (3) the Court erred by allowing 3M to introduce speculative evidence of non-causal alleged negligence; (4) there was insufficient evidence of causal negligence of Teresko; (5) the Court erred by excluding critical testimony of Albers; and (6) the jury's damages verdict was against the weight of the evidence, shocks the conscience, and reflects extra-evidentiary prejudice against Plaintiffs. ECF No. 123-1 at 1. The Court takes up each argument in turn.

#### 3.2.1 Jury Instructions

Plaintiffs challenge the Court's decision not to issue three jury instructions: (1) "Duty of worker: preoccupation in work minimizes duty," Wisconsin Civil Pattern Jury Instruction 1051; (2) "Emergency," Wisconsin Civil Pattern Jury Instruction 1105A; and (3) "Presumption of no negligence: memory loss," which is a modification of Wisconsin Civil Pattern Jury Instruction 353. *Id.* at 1–2, 3, 7; ECF No. 137 at 22. Plaintiffs argue that had the Court issued these instructions, "the jury would likely have exonerated . . . Teresko from negligence, or at least significantly mitigated his percentage of causal fault." ECF No. 123-1 at 2. Plaintiffs' arguments are unavailing.

---

[13]Because the parties largely cite to the rough trial transcripts in their briefing, rather than the final trial transcripts that the Court used to compile its evidentiary summary *supra* Section 2, the Court omits internal citations to the rough trial transcripts throughout the remainder of this Order for brevity.

"*Where supported by sufficient evidence*, a plaintiff is entitled to have the jury instructed by the Court on the theory of his case." *Cameo Convalescent Ctr., Inc. v. Senn*, 738 F.2d 836, 841 (7th Cir. 1984) (collecting cases) (emphasis added). The Court did not include these three requested instructions because there was insufficient evidence to support them. The Court stands by that conclusion and elaborates on it below.

### 3.2.1.1   Worker Preoccupation Instruction

The "Duty of worker: preoccupation in work minimizes duty" instruction reads:

> Momentary diversion of attention or preoccupation of a worker in the performance of work minimizes or reduces the degree of care that would otherwise be required of him or her; nevertheless, a worker has the duty to use the same degree of care for his or her safety that an ordinarily prudent worker would use under such conditions (when preoccupied with work) (when his or her attention was momentarily diverted by work).

Wis. J.I.—Civil 1051. As to this instruction, the Court stated at the jury instruction conference that "there is no evidence to support that [Teresko] was distracted." ECF No. 137 at 13. "In point of fact," the Court found that "there is a pretty significant gap in the evidence." *Id.*

The Court explained that Navickis came down the tower first, and that there is no evidence from any witness as to whether Teresko had even finished his work at the time that he fell. *Id.* Specifically, there was no evidence as to whether Teresko was "in the middle of putting a zip tie on or packing his tools and he slipped or where all of his harnesses were." *Id.* at 14. In the end, the accident was never appropriately reconstructed, which, in turn, left 3M in the dark because it did not know "a thing about this case until [it was] sued." *Id.* at 14, 17–18.

Indeed, not all of Teresko's equipment was produced in this case. *Id.* at 13; ECF No. 133 at 51 (3M's opening argument: "[U]nfortunately there's some evidence that we simply do not have. For instance, you're going to hear Mr. Teresko was climbing that day with a tool bucket. We don't have it."); ECF No. 131 at 20 (3M's closing argument: "We don't know about this equipment. We know . . . Teresko had some equipment at his house. He turned it over to Mr. Trecek. Do we know if everything got over there? No, we don't. We also know that there was evidence at the scene that wasn't recovered that maybe somebody could have looked at to figure out what happened. Don't know where it is."). A photo taken by the police when they investigated a storage area at the scene showed a plethora of equipment that was never produced or investigated:



**Image depicting equipment at the subject worksite, much of which was never produced at trial or testified to have been investigated, Trial Exhibit No. 19 at 20**

Unfortunately—and inexplicably—the evidence elicited at trial bore out these remarks; the jury never saw or heard what happened to most of the equipment shown in the storage area depicted above, or the equipment

that was discussed at trial. The jury heard that Teresko's gloves were lost, and it heard that Dr. Russell did not investigate the cable, available equipment, or the scene until June 2022, over two years after the accident occurred. The scene was different by the time that Dr. Russell inspected it. The jury also heard that Teresko broke through the bracketry at the base of the tower, but it heard no testimony—and ostensibly no investigation was done—into how breaking through the bracketry affected the device, other than Small's testimony that the device was working properly when he inspected it. In other words, no inspection was done of the device using what was known about the fall to try to reconstruct the fall, or at least none was elicited at trial. Further, no one was able to inspect the gloves, which the jury heard were lost, which could have revealed fibers or markings showing what Teresko grabbed. Little else was elicited about an investigation into or the chain of custody of the missing equipment, which, together with the delay in Dr. Russell's investigation and the lack of account for all the equipment, leaves but two conclusions: no investigation was done, or everything but the equipment specifically described to have been investigated was inexplicably lost.

Indeed, no effort at reconstruction appears to have been done at all. No one informed 3M about the fall until this lawsuit was filed almost three years after the fall, rendering 3M unable to perform a root cause analysis or to conduct any kind of meaningful investigation given the passage of time. Evidence elicited at trial revealed that Nomedas asked Plaintiffs' lawyers about informing 3M of the fall, but that Plaintiffs' lawyers did not do so or instruct Nomedas to do so.

The Court further reasoned at the jury instruction conference that "the jury is probably going to wonder who took that cable down that was

Page 54 of 95

rolled up in the . . . garage," shown in the image below, when that was done, as well as whether other tools were left on the tower:



**Image depicting rolled up cable in what Dr. Russell testified to be the City of Milwaukee evidence storage and vehicle maintenance bay for Dr. Russell's inspection in June 2022, Trial Exhibit No. 59 at 1; ECF No. 134 at 152–55**

ECF No. 137 at 13. These questions were never answered at trial and remain unanswered today. The fact that it is unknown how or when the cable was taken down and the fact that no meaningful investigation was done also reveals another significant gap in the record: it is unknown whether Teresko had properly pushed the cable back into all or any cable guides he passed while he ascended. If he had done so, presumably the X3 would have broken through and dislodged the cable retention clips during his fall, providing additional details necessary to completing a meaningful investigation and reconstruction of the circumstances of the fall including exactly where it began. Unfortunately, the trial record is barren as to whether the safety cable had been reinserted back in the cable guides as the climbers ascended and as Navickis descended, and if so whether they were damaged or dislodged as Teresko fell.

The jury may also have wondered about the weather, including the wind speed and the ambient air temperature, which questions were never answered at trial and remain unanswered today. *Id.* at 13–14. The jury also considered the fact that out of more than 140,000 devices sold with more than 28 million hours of use, there were only a handful of incidents.



**Image from 3M's closing argument slide deck, ECF No. 116 at 40**

*Id.* at 17 ("One in . . . 140,000, that's a tough, tough slog."). In the Moore incident, the plaintiff testified that the device deployed with flying colors, and in the other prior incidents examined at trial, it was later discovered that the X3 traveled only approximately one foot, which is within the ANSI standard of 20 inches. *Id.* Tellingly, like in this case, 3M was unable to perform a root cause analysis in these prior incidents due to lack of employer cooperation. Finally, no evidence was presented regarding Teresko's bloodwork at the hospital after the fall, which would have revealed either the presence or absence of alcohol or controlled substances on February 8, 2020.

In their Rule 59 motion, Plaintiffs fault the Court for focusing on only the "momentary diversion of attention" aspect of the instruction and not the "preoccupation of a worker in the performance of work" aspect of the instruction. ECF No. 123-1 at 3. Not so. The Court discussed, at length, the fact that there is no evidence supporting whether Teresko was actually performing work when he fell, particularly given the dearth of investigation into the accident in general.

Plaintiffs now argue that the task of climbing the tower also constitutes Teresko's work and that the record shows that a climber must always maintain focus to make sure he doesn't miss a peg while climbing. *Id.* at 6. That may be true, but as 3M notes, a reasonable jury may have considered Navickis' testimony regarding what Teresko was doing when he fell the strongest evidence in the record on that point. Navickis testified that Teresko was "stationed, probably resting" ten seconds before he heard the "zip line sound" indicating that Teresko was falling. ECF No. 140 at 3; *see also Walsh v. Wild Masonry Co.*, 241 N.W.2d 416, 419–20 (Wis. 1976) (preoccupied worker instruction inappropriate because "nothing untoward happened at that time which, by any stretch of the imagination, so diverted him that he should be relieved of avoiding the hazard of which he was fully aware") (citing *Heldt v. Nicholson Mfg. Co.*, 240 N.W.2d 154 (Wis. 1976), *Sampson v. Laskin*, 224 N.W.2d 594 (Wis. 1975), and *Gunning v. King*, 23 N.W.2d 602 (Wis. 1946)).

The record also supports the inference that Teresko was taking a photograph in the seconds or minutes leading up to the fall at a time that he was suspended from the tower and off the carrier platform. The support structure is shown to the right of the third picture that he took at 17:28:20, which compared with the prior picture showing the support structure

Page 57 of 95

under Teresko's carrier platform, indicates that he had left the platform at the time of the third picture. Navickis called 911 at 4:30 PM. Although the timestamp on the third photograph demonstrates an eastern time zone time of 5:28:20 PM, and Teresko testified that he did not check the time settings on the camera and that the timestamp looked computer added, a reasonable jury could certainly infer that the camera settings were one hour off and that the picture was taken moments before Teresko fell.

If the jury inferred that Teresko was taking the picture off the carrier platform, the jury could also have inferred that he was not, at that point, maintaining three points of contact, since he needed one hand to take the picture, and his other hand was pointing. A reasonable jury could have found Teresko's testimony that it is impossible to take a picture while hanging off the cable incredible in the face of this evidence. Even if Teresko had secured with lanyards at that time, Small testified that lanyards, too, create a fall hazard. And if the jury instead inferred from Navickis' testimony that Teresko was resting right before he fell (as opposed to taking a picture), it also heard testimony that Teresko sometimes used the unsafe, taped-open work positioning device to rest. The preoccupied worker instruction "is only appropriate under facts which indicate that the worker's attention was diverted or that he was preoccupied to the extent that he could not be expected to use a usual degree of care for his own protection," not where the facts allow for the inference that the worker created his own preoccupation or hazard. *Est. of Bowen v. Ringer*, 375 N.W.2d 220, 1985 WL 188143, at *4 (Wis. Ct. App. 1985).[14]

---

[14]*See* Civ. L.R. 7(j)(1) ("[T]his Court does not prohibit the citation of unreported or non-precedential opinions, decisions, orders, judgments, or other written dispositions.").

Plaintiffs next argue that the preoccupied worker instruction should apply because the reflexive nature of a panic grab caused Teresko "to forget a previously acknowledged hazard"—that he knew not to touch his X3. ECF No. 141 at 4 (quoting *Bain v. Tielens Const., Inc.*, 718 N.W.2d 240, ¶ 14 (Wis. Ct. App. 2006) ("[W]e can say the preoccupied worker doctrine applies not only when the worker is unaware because risk is unknown from the outset and preoccupation prevents the risk's discovery, but also when the worker is unaware because concentration on the task at hand has caused the worker to forget a previously acknowledged hazard.")).

However, as 3M argues, "a reflexive reaction has nothing to do with being preoccupied by work—a reflexive action occurs regardless of what someone is doing . . . ." ECF No. 140 at 6 (citing *Suhaysik v. Milwaukee Cheese Co.*, 392 N.W.2d 98, 101 (Wis. Ct. App. 1986) (holding worker preoccupation instruction inapplicable where no evidence established that worker slipped on greasy spot because he was preoccupied with work; instead, evidence supported that worker slipped because the greasy spot was invisible)). And, as noted, there is simply no evidence that Teresko was preoccupied either actually performing work or climbing the tower at the time he fell; rather, the evidence shows the contrary: that he was resting on the side of the tower perhaps using his taped-open work positioning device, or that he was on the side of the tower taking a picture in an unsafe manner contrary to his training (which could appear to a person standing on the ground to be resting).

Plaintiffs contend that 3M "continuously blurred the line" between its theory that Teresko grabbed the X3 *before* he fell and Plaintiffs' theory that Teresko panic grabbed the X3 *during* the fall sequence, thus weakening 3M's argument that the preoccupation instruction was inappropriate

because a panic grab is reflexive. ECF No. 123-1 at 4; ECF No. 141 at 4–5 ("3M argued throughout the trial that regardless of the circumstance, Mr. Teresko was negligent for touching the X3. The jury was entitled to know that any negligence in doing so while preoccupied with the dangerous task of climbing is mitigated under Wisconsin law."). Plaintiffs point to comments from 3M's counsel in opening and closing statements that "panic grab with a lateral load . . . is an intentional, unforeseeable misuse" and questions from 3M's counsel during cross examination suggesting the same. ECF No. 123-1 at 4–5; *see, e.g.*, *id.* (3M asking Small: "Q. And as I showed you, sir, if was [sic] panic grabbing and laterally loading the device, you testified already that would be an intentional misuse of the device; correct? A. Yes.").

The Court disagrees with Plaintiffs' characterization of 3M's arguments and questioning. The Court held the following when it denied Plaintiffs' fifth motion *in limine* on this issue:

> Plaintiffs seek to prevent 3M from arguing that a panic grab is a product misuse; in other words, they argue that 3M should not be able to present evidence of Teresko's contributory negligence based on a product misuse theory. . . . 3M's X3 owner manual warns users not to "grasp the sleeve or cable while actively climbing." . . . . Plaintiffs contend that it is undisputed that a panic grab is "an involuntary, reflexive reaction to a fall from height," . . . that the X3 owner manual does not mention a panic grab, . . . and that panic grabs are foreseeable, which is why ANSI standards exist to design out panic-grab related failure. . . Conversely, 3M asserts, as it did to exclude the opinions of Dr. Russell, . . . that a panic grab is biomechanically impossible unless the user has their hands on the device before the fall. . . . In turn, if the user has their hands on the device before the fall, that would be a product misuse under the warnings set forth in the owner manual. . . .

> The Court already held, . . . that these are disputed fact issues, supported by sufficient evidence on each side, for the jury's consideration, and it is therefore not appropriate for resolution on a motion *in limine*.

ECF No. 73 at 49–50 (citations omitted).

3M did not deviate from this theory, and Plaintiffs' excerpted testimony is taken out of context. For example, 3M asked Miller, "If I grab this device, lift the lever up, apply a lateral force to it *like plaintiff's* [sic] *counsel's been doing for the past couple days*, is that unconscious and unintentional?" ECF No. 134 at 62 (emphasis added). Miller responded "no." *Id.* Miller also responded "yes" to 3M's question as to whether such an action was a misuse of the device. *Id.* 3M's questions were clearly intended to demonstrate that manipulating the device in a manner to simulate a panic grab in the courtroom is not an unconscious and unintentional act. 3M's question to Small was whether a panic grab sufficient to defeat the device, as counsel demonstrated in the courtroom—which would involve "lifting the lever in order to put a lateral force on it," requiring the climber to "move [his] thumb back and push sideways on the lever"—is an intentional misuse. ECF No. 136 at 94–95. This question was asked immediately after Small testified that the action would have to have happened before Teresko fell given the speed that the device locks.

During closing arguments, 3M's counsel stated that "panic grab with the lateral load . . . is an unforeseeable intentional misuse . . . because if you look here, this is the way Dr. Russell was testing it[,] . . . [y]ou have to hold that handle up, add the lateral force before a fall. That's why it's an intentional, unforeseeable misuse." ECF No. 131 at 29. 3M made a similar comment during opening arguments. ECF No. 133 at 31 ("[T]he only way

that you can cause that to happen is if you already have your hand on it, you've squeezed it, and you've applied this lateral load even before you start to fall. And they are going to tell you that is not how you're supposed to use this product."). It is clear that the jury understood this argument, and the distinction from Plaintiffs' theory of the case, as it asked to view Dr. Russell's testing videos against 3M's testing videos, as well as Dr. Seal's perception reaction testimony, again during deliberations. ECF No. 121 at 3; *see also supra* notes 7, 9.

Thus, 3M previewed and summarized the evidence as showing—and sought to show during trial—that panic grab as theorized by Plaintiffs' counsel is only possible in a misuse scenario, *not* that panic grab in a vacuum is intentional. Thus, for all these reasons, the Court again denies Plaintiffs' argument for the "Duty of worker: preoccupation in work minimizes duty" instruction.

### 3.2.1.2 Emergency Instruction

Plaintiffs' proposed "Emergency" instruction reads:

When you consider the question of negligence of plaintiff, Rytis Teresko, bear in mind that a person may suddenly be confronted by an emergency, not brought about or contributed to by his negligence. If you find that Rytis Teresko was confronted with an emergency and was compelled to act instantly, Rytis Teresko is not negligent if he makes a choice of action or inaction that an ordinarily prudent person might make if placed in the same position. This is so even if it later appears that his choice was not the best or safest course.

This rule does not apply to a person whose negligence wholly or in part created the emergency. A person is not entitled to the benefit of this emergency rule unless he is without fault in creating the emergency.

ECF No. 67-7 at 26–27; *see also* Wis. J.I.—Civil 1105A. As to this instruction, the Court stated at the jury instruction conference that there was nothing in the record supporting the instruction. ECF No. 137 at 21. It explained that, "[f]or example, had . . . Navickis testified there was arcing for some reason on the tower and everybody panicked, that's the sort of emergency" the instruction deals with. *Id.* However, the record was devoid of "even an inference" that such a situation occurred because it is unclear "in the timeline when or how this fall occurred." *Id.* at 21–22. Moreover, again, a lot of the equipment was missing and unable to be investigated to try to determine what happened. *Id.* at 22 ("Where were the tools? Was there a tool bucket on the ground on the end? What happened to it? Where were the two pair[s] of gloves? None of that was developed."). Once again, scant if any effort was ever made to try to reconstruct the accident with the little equipment that was available, and 3M was prevented from doing so due to lack of timely notice.

As the text of the instruction suggests, a person is "not entitled to the benefit of th[e emergency instruction] unless he is without fault in creating the emergency." *Borowske v. Integrity Mut. Ins. Co.*, 121 N.W.2d 287, 291 (Wis. 1963) (citation omitted); *see also McCrossen v. Nekoosa Edwards Paper Co.*, 208 N.W.2d 148, 156 (Wis. 1973) (emergency instruction appropriate where "there was evidence from which the jury could have concluded that, *through no fault of his own*, plaintiff was confronted with an emergency") (emphasis added). However, "[i]f there is a factual dispute as to such negligence . . . a person is entitled to the emergency-doctrine instruction and it is for the jury to determine its application." *Shaw v. Wuttke*, 137 N.W.2d 649, 651 (Wis. 1965) (citing *Misiewicz v. Waters*, 127 N.W.2d 776 (Wis. 1964)).

Here, as the Court pointed out, there was simply no evidence that any outside force contributed to Teresko's fall or the X3's functionality. For example, there was no evidence of weather conditions that would have affected the fall or other factors, such as debris or corrosion, that would have affected the X3's functionality. Again, had a reconstruction or investigation been timely performed, perhaps the evidence would have shown differently. But that was regrettably not the case. Small inspected the subject X3 and found it to be working properly and as intended. The cable was appropriate for use with an X3, and the X3 was properly attached to the cable. 3M agreed at trial that the only way it knows to defeat both locking mechanisms is applying lateral load to the handle, suggesting that Teresko had to have grabbed the device.

With respect to Plaintiffs' theory that the X3 failed because of a panic grab, for which Teresko cannot be contributorily negligent because it is a subconscious and reflexive action, there is slight evidence in the record from which a reasonable jury could conclude that Teresko panic grabbed his X3 in the manner that Plaintiffs' counsel suggests. ECF No. 123-1 at 7. Dr. Russell did not test his modified device on a real tower in the field or in cold weather (like Wisconsin in February); he instead tested it by "intentionally and deliberately" grabbing the X3 on the ground in his office, and without wearing gloves like Teresko was wearing when he fell. The jury heard that some of Dr. Russell's testing involved using both hands (which it may infer is even more improbable than a one-handed panic grab given the time that the X3 locks and a climber's body position on the tower), and that Dr. Russell did not test or take pictures using only a left-handed panic grab. Dr. Russell testified that he could not rule out that Teresko's equipment touched the X3, and he did not test or analyze fall reflex or

Page 64 of 95

reaction time. The jury also heard that Dr. Russell received one of the devices that he examined already disassembled by a prior expert, but it heard nothing of what happened to that expert. It further heard that Dr. Russell did not perform any testing where he attempted to apply lateral load *after* dropping the weight, nor did he test his modified device with contaminates or an amount of force above 28 or 29 pounds. All of these factors weaken the weight of the evidence proffered from Dr. Russell.

As noted, the jury requested during deliberations to view Dr. Russell's and 3M's testing videos anew, indicating that it understood the importance of verifying whether Dr. Russell's tests *only* showed lateral load applied before a fall began. *See supra* notes 7, 9. Simply put, Dr. Russell's testing did not strongly support that a panic grab—let alone a panic grab while wearing gloves—could occur in a fall scenario in the field quickly enough before the device locks. Conversely, which the jury could weigh against Dr. Russell, Miller testified that 3M attempted to perform a test to apply lateral load after a fall begins, but that it was impossible to do so given the speed at which the device locks compared to the way the user would need to manipulate his hands to defeat the device's locking mechanisms.

Whitman testified that a fall is a process, but he is admittedly not an expert in biomechanics. The experts that *do* specialize in fall protection and human factors respectively, Small and Dr. Seal, opined that there is not enough time to manipulate the device in the manner necessary to defeat both braking mechanisms in the 0.1 seconds that it takes the X3 to lock up. The only way this would work, according to these experts, is if the user's hand is on the device before the fall, which is the scenario that Dr. Russell's tests model. Dr. Seal testified that a fall sequence would take, at a minimum,

0.75 seconds, and bulky clothing and gloves would likely lengthen that time.

Plaintiffs' fallback theory holds slightly more water, but a reasonable jury could certainly find it to be unsuccessful against the weight of the evidence. Dr. Seal conceded that the X1 was recalled because it could be panic grabbed in enough time to negate the mechanical brake. Under Plaintiffs' fallback theory, Teresko's upper torso would have been falling back and he would have panic grabbed the device and defeated the mechanical brake before the inertial brake—absent from the X1 but added with the X2 and X3—recognized the fall.

However, even though this scenario would allow for some amount of sleeve travel and time before the mechanical brake activates, perhaps three or four inches as Plaintiffs' counsel posited to Miller, Small testified that the X3 grabs the cable and locks in 0.13 seconds for a sleeve travel of 3.25 inches. This is faster than the 0.2 seconds that Small and Dr. Seal opined to be the fastest perception reaction time of which they are aware, and faster than Dr. Seal's opinion that a fall sequence would take 0.75 seconds and longer with bulky gloves. Miller also testified that the mechanical brake would lock in this scenario in about 0.1 seconds. While Whitman dubbed a panic grab a "reflex," he is not an expert in biomechanics, and that characterization is belied by both Small and Dr. Seal, who are so qualified in their respective fields to opine on the issue. For that matter, Dr. Grunert, though again not an expert in biomechanics, testified that "intense feelings" related to the sensation of falling would not begin until after the actual fall begins.

Most importantly, however, because no investigation or reconstruction was done, there is absolutely no evidence that such a

fallback scenario occurred. In fact, the evidence—discussed *supra* Section 3.2.1.1 and *infra* Sections 3.2.2, 3.2.3, and 3.2.4—more convincingly shows that Teresko was either resting against the tower in a manner that a reasonable jury could infer was unsafe due to Teresko's testimony that he sometimes rested using the taped-open work positioning device, or that he was taking pictures against the tower in a manner that a reasonable jury could infer was unsafe because he was not maintaining three points of contact. Thus, because there is no evidence of a force outside of Teresko's control causing an emergency, and because there *is* evidence of his contributory negligence, he was not—and is not—entitled to the emergency instruction. The Court accordingly again rejects Plaintiffs' arguments for this instruction.

### 3.2.1.3   Memory Loss Instruction

Plaintiffs' proposed "Presumption of no negligence: memory loss" instruction reads:

> There is a presumption that a plaintiff who loses his memory and cannot testify about an event was not negligent. Because Rytis Teresko cannot remember the subject incident, you must presume that he was not negligent at and before the time of the occurrence, unless you find the presumption is overcome by other evidence.

> In deciding whether he was negligent, you must weigh the presumption with all the other evidence. Unless you are satisfied by the greater weight of the credible evidence, to a reasonable certainty, that it is more likely that he was negligent, you must find that he was not negligent.

ECF No. 67-7 at 27. The instruction derives from case law and it is not an instruction approved in the Wisconsin Civil Jury Instructions, though it is modeled after Wisconsin Civil Jury Instruction 353, titled "Presumptions:

deceased person was not negligent." ECF No. 67-8 at 4–5; ECF No. 123-1 at 11–13; ECF No. 140 at 8; Wis. J.I.—Civil 353.

Plaintiffs rely on *Ritter v. Penske Trucking Leasing Company, L.P.*, where the court held that "[i]n some circumstances, a person with memory loss due to retrograde amnesia is entitled to a presumption that he or she acted with due care." 828 N.W.2d 293, 2013 WL 530487, ¶ 9 (Wis. Ct. App. 2013) (citing *Walter v. Shemon*, 66 N.W.2d 160 (Wis. 1954)). This presumption, however, "is a *limited* presumption and is eliminated upon the receipt of evidence from which negligence on the part of [the person with amnesia] may be inferred." *Id.* (quoting *Brunette v. Dade*, 131 N.W.2d 340, 342 (Wis. 1964)). Further, though not a foundational requirement, "[c]ourts are hesitant to give a plaintiff a presumption of due care 'in the absence of some evidence' from a medical professional that his or her failure of memory is due to retrograde amnesia." *Id.* ¶ 10 n.2 (quoting *Ernst v. Greenwald*, 151 N.W.2d 706 (Wis. 1967)).

As to this instruction, the Court stated at the jury instruction conference that there is "nothing in the record that would allow the entertainment of a presumption of assumption of no negligence on the part of . . . Teresko." ECF No. 137 at 23. As noted, under *Ritter*, the presumption is eliminated upon the receipt of evidence suggesting contributory negligence. And as described *supra* Section 3.2.1.1 and 3.2.2.2 and *infra* Sections 3.2.2, 3.2.3, and 3.2.4, there is a plethora of evidence indicating that Teresko was contributorily negligent, and so the instruction was and is inappropriate on that basis alone. *See Brunette*, 131 N.W.2d at 342 (retrograde amnesia presumption inappropriate because there was "some credible evidence as to [the plaintiff's] negligence as to lookout"; thus, "the

presumption of due care which [the plaintiff] might otherwise have enjoyed became wholly dissipated").

However, the instruction is also inappropriate because "the assertion in this case of retrograde amnesia is based solely on [Teresko's] testimony that he was unable to recall the facts of the accident." *Ernst*, 151 N.W.2d at 712. As in *Ernst*, there is "not one whit of medical testimony that [Teresko] had amnesia, that the injury sustained by [Teresko] caused any amnesia, or that, to a reasonable degree of medical probability, such amnesia would be the likely result of the injuries sustained." *Id.* Plaintiffs argue that Teresko's medical records from his initial hospitalization show "trouble remembering . . . the event" and "moderate deficit, short term memory," and that Dr. Grunert testified that Teresko does not remember the fall and that PTSD patients do not retain traumatic memories. ECF No. 141 at 8 (citing Exhibit No. 227 at 1522, 1701, 1702–03). But there is no indication that these records and testimony reflect *diagnoses* of amnesia, and there was scant "attempt[] to link the injuries to the amnesia that [Plaintiffs] now allege[]." *Ernst*, 151 N.W.2d at 712. Thus, the memory loss instruction is inappropriate on this independent basis as well, and the Court again rejects Plaintiffs' arguments accordingly.

### 3.2.2   Panic Grab as Causal Negligence

Plaintiffs assert that "there is no doubt that the jury found Teresko grabbed the device with lateral load as a basis for its verdict because the jury found the X3 defective and causal." ECF No. 123-1 at 9 (citing ECF No. 122). They suggest that, based on the verdict, "the jury undoubtedly adopted the defense argument that . . . Teresko was negligent for grabbing the X3 and applying lateral load to the handle of the X3," which is unfair because, throughout the trial, "3M blurred the distinction between

reflexive, uncontrollable panic grab of the device at the initiation of the fall sequence, and misuse of the X3 by grabbing it before the fall sequence started." *Id.* at 13.

Under Wisconsin law, "sudden unforeseen physical disability over which a [person] has no control, such as being the victim of a heart attack, epileptic seizure, or other loss of consciousness which is sudden and unforeseen . . . [is] not voluntary and in and of [itself] do[es] not constitute negligence." *Theisen v. Milwaukee Auto. Mut. Ins. Co.*, 118 N.W.2d 140, 143 (Wis. 1962) (citing *Bushnell v. Bushnell*, 131 A. 432 (Conn. 1925), *Steele v. Lackey*, 177 A. 309 (Vt. 1935), and *Kaplan v. Kaplan*, 239 N.W. 682 (Iowa 1931)). Consequently, Plaintiffs contend that they were prejudiced by 3M's arguments that a panic grab constitutes contributory negligence, and they ultimately challenge the Court's denial of their motion *in limine* on this issue. ECF No. 123-1 at 14–15.

As excerpted *supra* Section 3.2.1.1, when reviewing Plaintiffs' motion *in limine* on this issue, the Court summarized 3M's theory as "a panic grab is biomechanically impossible unless the user has their hands on the device before the fall. . . . In turn, if the user has their hands on the device before the fall, that would be a product misuse under the warnings set forth in the owner manual." ECF No. 73 at 50. This was the evidence that the Court permitted 3M to present with respect to "a product misuse theory." *Id.* at 49–50. The Court did not rule that 3M could argue that a panic grab in a vacuum constitutes contributory negligence.

"A pretrial ruling is definitive only with respect to subjects it covers." *Wilson v. Williams*, 182 F.3d 562, 568 (7th Cir. 1999). The Court's ruling covered the topic of 3M's speed defense and, to the extent Plaintiffs intended to lodge an objection to 3M's alleged stray outside of that topic,

they needed to have objected on the record. They did not do so, and so the issue is more than likely waived. *See Petkus v. Richland County*, No. 12-CV-104-WMC, 2013 WL 5726203, at *1 (W.D. Wis. Oct. 22, 2013), *aff'd*, 767 F.3d 647 (7th Cir. 2014); *see also Lieberman v. Washington*, 128 F.3d 1085, 1095 (7th Cir. 1997) ("It is axiomatic that, '[t]o preserve an issue for appellate review, a party must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection.'") (quoting *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir. 1988)).

At any rate, even if the issue were firmly preserved, as explained above, the Court has reviewed each of the excerpts that Plaintiffs proffer—which, again, they submit out of context—and each one was squarely tied to 3M's theory that a panic grab as theorized by Plaintiffs' counsel requires a manipulation of the hands that can be done on the ground in the courtroom, but which cannot be done quickly enough in a fall scenario on a monopole tower given the speed at which the X3 locks. A reasonable jury could conclude that the evidence plainly shows that a panic grab in this manner cannot be performed in a way that is *not* a product misuse in a traditional "drop fall" scenario, and that Dr. Russell's testing, given the conditions in which it was performed and the nature of the tests, does little to rebut that conclusion. As the Court also explained, a reasonable jury could find the "fallback" scenario more persuasive, but the evidence still shows that there is not enough time for a panic grab to be performed in this scenario due to the way that the device is designed. Moreover, there is no evidence that Teresko fell in a fallback scenario. The evidence that *did* come in could have allowed a reasonable jury to infer that Teresko was either resting or taking photographs, in either case in an unsafe manner, at the time that he fell.

As elaborated upon further *infra*, a reasonable jury certainly could have—and likely did here—determine that the X3 could have been designed better to avoid the misuse scenario, but that it nonetheless *is* a misuse scenario, for which a greater percentage of fault should be attributed to the climber, particularly when combined with additional evidence showing that climber's proclivity to take safety shortcuts. Thus, the Court stands by its holding on the pertinent motion *in limine* and denies Plaintiffs' argument that 3M should not have been able to present its lock speed theory.

### 3.2.3   Speculative Evidence of Non-Causal Negligence

As the Court instructed the jury, the burden of proof to establish Teresko's contributory negligence was on 3M, and the burden was to prove the claim by the "greater weight of the credible evidence." ECF No. 120 at 16; *see also* ECF No. 123-1 at 15 (citing *Helmbrecht v. St. Paul Ins. Co.*, 362 N.W.2d 118, 132 (Wis. 1985) and *Nommensen v. Am. Cont'l Ins. Co.*, 629 N.W.2d 301, ¶ 9 (Wis. 2001)). Plaintiffs claim, citing their eleventh motion *in limine*, that they "moved the Court to exclude evidence of speculative alleged causes of Teresko's fall and that Teresko was negligent in causing his fall." ECF No. 123-1 at 16 (citing ECF No. 67-4 at 52).

In their eleventh motion *in limine*, Plaintiffs raised two issues: (1) that Small should not be able to opine that the arrangement of the step bolts on the tower may have contributed to or caused Teresko's fall; and (2) that "[t]o the extent that 3M wishe[s] to allege that Teresko was contributorily negligent or any third-party was negligent in initially causing Teresko's fall, it has failed to obtain adequate evidence to satisfy its burden. No testimony or argument should be permitted at trial speculating as to the initial cause of Teresko's fall. . . ." ECF No. 67-4 at 52–53. In response to the eleventh

Page 72 of 95

motion *in limine*, 3M asserted that Small will not opine as to the step bolts at trial unless it becomes relevant. *Id.* at 53.[15] It also argued that it is entitled to "elicit circumstantial evidence about the subject incident and argue for reasonable inferences based on that evidence." *Id.* at 53–54 (citing Wis. J.I.—Civil 230 and Seventh Cir. Pattern J.I. 1.12). It maintained that there was ample circumstantial evidence that Teresko misused the X3 or otherwise contributed to his fall, mainly citing to Small's and Miller's deposition testimony that it is physically impossible to panic grab the X3 during a fall given how quickly the X3 locks. *Id.* at 54. It argued, as it consistently has throughout this case, that the only way for panic grab as Plaintiffs theorize to have occurred would be for Teresko's hand to have been on the X3 before he fell. *Id.*

The Court held in its order on Plaintiffs' eleventh motion *in limine*, as it had covered earlier in the order as to other pretrial motions, that "the issue of contributory negligence with respect to alleged product misuse (i.e., whether a panic grab as described by Dr. Russell is biomechanically possible without being a product misuse) is both disputed and supported by sufficient evidence on both sides." ECF No. 73 at 59 (citation omitted).

Plaintiffs now argue that 3M took full advantage of this "erroneous ruling" by arguing "divided responsibility" between Teresko and 3M based on "a host of speculative alleged contributory factors that it believed possibly could have contributed, but none of which were proved." ECF No. 123-1 at 16. The factors that Plaintiffs list are wind conditions, safety checks/training, the taped-open carabiner, taking photos, and equipment issues. *Id.* They contend that these factors are non-causal and "totally

---

[15]Small ultimately did not so opine at trial.

irrelevant to [the] issues the jury was tasked with deciding," thus significantly prejudicing them. *Id.* at 19.

To begin, once again, "[a] pretrial ruling is definitive only with respect to subjects it covers." *Wilson*, 182 F.3d at 568. More importantly as to Plaintiffs' eleventh motion *in limine*, "[o]nly arguments that were actually presented to the district court before trial are preserved for appeal." *Id.* at 567. Plaintiffs broadly moved to exclude all evidence of contributory negligence, without specifying whatsoever to which evidence they were referring. Throughout the balance of the motions *in limine*, Plaintiffs consistently challenged 3M's speed theory, and so this is the theory on which the Court ruled on the eleventh motion *in limine*. The Court was not confronted with any of the other alleged non-causal factors, and it certainly did not rule on them. Thus, to preserve the issue, again, Plaintiffs needed to have objected on the record at trial, but they did not. ECF No. 140 at 14. The issues are therefore again, and more clearly this time, waived. *See Petkus*, 2013 WL 5726203, at *1; *see also Lieberman*, 128 F.3d at 1095.

However, even if they were not waived, Plaintiffs' argument that these alleged non-causal factors are speculative and irrelevant is an absolute non-starter. Although Teresko testified that he did not use the taped-open work positioning device as a safety device and that he mainly used it to carry his tools, he also testified that he used it, at times, to rest. He testified that when using it to rest, he also attached himself to the tower using his lanyards. Navickis testified that ten seconds before Teresko fell, he was stationary and probably resting. The photographs that a reasonable jury may infer were taken seconds or minutes before Teresko fell indicate that Teresko had already left the carrier platform at that time; thus, the jury

could infer that he was tethered only to the tower while stationary and resting, as Navickis described.

Small testified that the taped-open work positioning device is not safe for any purpose, that using such a device is an indicator of somebody who may consciously take other safety shortcuts, and that lanyards themselves pose a fall hazard. A reasonable jury was entitled to weigh Teresko's testimony against Small's and determine whether Teresko was indeed the "safety freak" he claimed to be or whether he took shortcuts as to his safety when resting or taking pictures. At a minimum, Teresko's testimony that he used the device to rest, Navickis' testimony that Teresko was resting ten seconds before he fell, and Small's testimony that a taped-open device suggests an individual who may take shortcuts all linked the use of the taped-open work positioning device to the circumstances of the fall. This evidence simply was not speculative or irrelevant.

In the same vein, evidence of Teresko's training is also neither speculative nor irrelevant. Dr. Seal's testimony that Teresko is responsible for his own safety—in addition to Nomad's responsibility for Teresko's safety—is supported by Wisconsin law. *See Hofflander v. St. Catherine's Hosp., Inc.*, 664 N.W.2d 545, ¶ 45 (Wis. 2003) ("The concomitant principle is that every person in all situations has a duty to exercise ordinary care for his or her own safety.") (citing Wis. J.I.—Civil 1007); *see also* ECF No. 120 at 15 (jury instruction that "Mr. Teresko had a duty to use ordinary care for his own safety and protection and to observe all defects and dangerous conditions, if any, which were open and obvious to him if he was using reasonable care and caution for his own safety and protection. The danger, however, must not only have been obvious, but also must have been understood by Mr. Teresko").

The evidence received at trial as to training was inconsistent. Teresko and Navickis testified that they received training from Nomad, but Nomedas testified that Nomad had no fall protection training program. Navickis also testified that Teresko never trained him to check the X3 before descending and that it would surprise him to learn that Teresko believes doing so is important. A reasonable jury could infer that Teresko did not check his X3 before descending the tower, which again, could lead the jury to conclude that he took shortcuts with his own safety. The jury also heard that Teresko violated OSHA regulations by using a ladder taller than six feet to ascend to the climbing pins without fall protection, which may compel the same inference.

The same is true with the evidence that Teresko was taking pictures on the tower. The Court discussed the inferences that a reasonable jury could make from this evidence at length *supra* Section 3.1.1.1. A reasonable jury could assess the timestamps, even considering Teresko's testimony about the accuracy of the timestamps, as compared to what is shown in the pictures and the time that Navickis called 911, to determine that Teresko may have been stationed off the tower (as opposed to on a carrier platform) and taking pictures—in lieu of simply resting—when Navickis saw him ten seconds before the fall. If this was the case, the pictures show that he was not consistently maintaining three points of contact while climbing the tower as required of him. Together with Navickis' testimony, the evidence gleaned from the pictures is again, neither speculative nor irrelevant. It is properly proffered circumstantial evidence, which the jury was correctly instructed to consider. ECF No. 120 at 6 ("The law makes no distinction between the weight to be given either direct or circumstantial evidence. Therefore, all the evidence in the case, including circumstantial evidence,

Page 76 of 95

should be considered by you in arriving at your verdict. It is for you to decide whether a fact has been proved by circumstantial evidence.").

The only comment that Plaintiffs challenge with respect to wind conditions is 3M's counsel's comment in closing arguments that "[w]e don't know what the wind conditions were that day." ECF No. 123-1 at 17. As far as the Court is concerned, this statement went to and bolstered the evidence—or, more accurately, the lack thereof—elicited at trial about the dearth of a timely and thorough investigation. The Court elicited the lack of knowledge about the weather on the date of the fall through its own questions to Teresko, which the Court reiterated to the parties during the jury instruction conference. Because (1) Plaintiffs did not timely conduct a thorough investigation, (2) there is no account of what happened to much of the equipment at the scene, and (3) 3M was completely left out of the loop and given no opportunity to perform a timely root cause analysis or inspection, little was and is known about the accident, and no meaningful reconstruction was ever completed. The lack of evidence concerning these factors was and, to be sure, remains relevant to the jury's determination of the case. Therefore, the Court denies Plaintiffs' arguments regarding alleged non-causal and speculative causes of Teresko's fall.

### 3.2.4   Teresko's Contributory Negligence

Plaintiffs argue that "[b]ecause the jury found 3M's device causally defective, [they] know that the jury adopted [P]laintiffs' only theory of defect that Teresko was able to defeat the X3's brake by grabbing the device with a lateral load." ECF No. 141 at 11. However, they contend, "there was no evidence beyond speculation from which the jury could rationally make the choice between negligent grabbing of the device while climbing and

non-negligent, reflexive grabbing during the fall sequence." *Id.*; *see also* ECF No. 123-1 at 21.

To begin, the Court agrees with 3M that Plaintiffs waived their sufficiency challenge by failing to preserve it in a Rule 50(a) motion. *See Savino v. C.P. Hall Co.*, 199 F.3d 925, 931 (7th Cir. 1999) (citing *EEOC v. AIC Sec., Ltd.*, 55 F.3d 1276, 1286 (7th Cir. 1995)). However, even if it were not waived, the argument still goes nowhere.

The Court has now discussed at length that a reasonable jury could find Plaintiffs' non-negligent theory of the case disproved by the evidence elicited at trial. Dr. Russell's testing did little to establish that a complicated hand maneuver sufficient to defeat both of the X3's braking mechanisms— which requires grabbing the lever with the thumb in a certain position behind the lever, squeezing it, twisting it, rotating it, and pushing it away from yourself—can occur in a monopole tower climbing scenario during a fall by an individual wearing bulky gloves given the time that the X3 locks up. A reasonable jury could find, and likely did here, that the misuse scenario in which Teresko's hand was on the device before he fell is the only conclusion compelled by the evidence regarding the X3's lock speed as compared to reaction time. As explained *supra* Sections 3.1.1.2, 3.2.2, and 3.2.3, it could also find Plaintiffs' fallback theory belied by this same evidence, together with the lack of any investigation into the equipment or fall reconstruction. In particular, the gloves could have revealed fibers or other indications of where and how Teresko grabbed the device, but regrettably, they were lost. Similarly, assessing whether the retention clips fell off the tower could have revealed whether Teresko had been correctly moving the cable in and out of the cable grabs and shed light on where his hands were at the time. But regrettably, again, that was not analyzed.

Page 78 of 95

Other evidence in the record, including that (1) Teresko at times rested with a taped-open carabiner, (2) Teresko was likely taking pictures on the side of the tower shortly before he fell, (3) Navickis saw Teresko resting or stationary at the side of the tower just before he fell, (4) Teresko did not consistently train employees to check their X3s before descending, and (5) Teresko ascended a ladder without fall protection in violation of OSHA regulations, further supports or at least allows a reasonable jury to infer that Teresko may have taken safety shortcuts and misused his device before he fell. While Plaintiffs suggest that the evidence can only support their non-negligent theory of the case, the record does not support that assertion and instead more strongly supports that Teresko grabbed the X3 before he fell. A reasonable jury certainly could have determined that the X3 should be designed to avoid the misuse scenario of grabbing the X3 before the fall begins, but that it nonetheless *is* a misuse scenario, for which a greater percentage of fault should be attributed to Teresko. Thus, the Court rejects Plaintiffs' arguments that 3M proffered insufficient evidence of contributory negligence.

### 3.2.5   Exclusion of Albers' Lost Earnings Opinion

In addition to their liability arguments, Plaintiffs assert that any new trial should include damages. 3M disagrees, contending that "[t]he damages findings were granulated and not affected by any alleged issue with the jury's liability determinations." ECF No. 140 at 18 (citing *Schmitz v. Canadian Pac. Ry. Co.*, 454 F.3d 678, 684 (7th Cir. 2006) and *La Plante v. Am. Honda Motor Co., Inc.*, 27 F.3d 731, 738 (1st Cir. 1994)). The Court agrees with 3M, but in the interest of thoroughness, proceeds to address Plaintiffs' contentions as to damages. The Court first addresses Plaintiffs' arguments regarding its exclusion of Albers' lost earnings opinions.

Before trial began, 3M moved under Federal Rule of Evidence 702 to exclude Albers' lost earnings opinions. ECF No. 57. The Court granted the motion, finding that, under Wisconsin law, competent evidence to show loss of earning capacity for a self-employed person where "the income of the business is chiefly the result of capital invested or the services of others," such as Teresko's self-employment with Universal Tower, is "the market value of the services which the plaintiff was prevented from giving, that is, the amount commonly paid for such services in businesses of like nature." ECF No. 73 at 30–31, 33 (quoting *Schaefer v. Am. Fam. Mut. Ins. Co.*, 531 N.W.2d 585, 595–96 (Wis. 1995) and *Featherly v. Cont'l Ins. Co.*, 243 N.W.2d 806, 811 (Wis. 1976)).

In this case, Albers determined that Teresko's lost earning capacity is between $200,000 to $240,000 per year. *Id.* at 31. Her report states that she arrived at these figures based on an analysis of Teresko's self-employment at Universal Tower, where he grossed between approximately $160,000 and $466,000 per year. *Id.* at 31–32 (citing ECF No. 53-17 at 21). However, her report indicates that she also considered the fact that the business took deductions for investments, leading to a net income to Teresko from the business of between $4,000 and $16,000 in the pertinent years. *Id.* at 32 (citing ECF No. 53-17 at 22). Albers wrote that she had reviewed the single W-2 from Teresko's one month with Nomad showing that he had earned approximately $20,000 in this time, though this document was not "cited in her lost earning capacity analysis." *Id.* (citing ECF No. 53-17 at 2). Finally, she stated in her report that Teresko had self-reported to her that "he took home (as salary) approximately $200,000 to $240,000 per year." *Id.* (citing ECF No. 53-17 at 22). The Court found these supporting documents and information—particularly Teresko's self-reported income—insufficient for

purposes of Rule 702 given the applicable legal standard in Wisconsin: that the market value of Teresko's services is the appropriate evidentiary foundation for lost earning capacity. *Id.* at 33.

The Court further found that "[t]o the extent that Albers's opinion was based on the 2020 W-2—or, in other words, to the extent that Plaintiffs' lost earning capacity theory is that Teresko would have abandoned his business and remained with Nomad had he not been injured—the single W-2 is insufficient evidence to establish lost earning capacity." *Id.* at 33–34 (citing *Tate v. Troutman*, 683 F. Supp. 2d 897, 912 (E.D. Wis. 2010), *aff'd sub nom. Tate v. Riegert*, 380 F. App'x 550 (7th Cir. 2010)). The Court held that facts could be elicited at trial to "*bolster* the $20,000 per month amount established by the 2020 W-2," such as testimony from Nomedas. *Id.* at 34 (emphasis added). However, because Albers "did not base her opinion . . . on these facts or data . . . it must be excluded under Rule 702." *Id.*

Plaintiffs now challenge the Court's decision to exclude Albers' lost earning capacity opinion. ECF No. 123-1 at 22. First, they argue that the Court inappropriately focused on the "conclusions" that Albers arrived at instead of her methodology. *Id.* (collecting cases). Not so; the Court squarely focused its holding on the fact that Albers' opinions were not based on sufficient facts or data, not on the generated conclusions. *See* Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: . . . (b) *the testimony is based on sufficient facts or data* . . . .) (emphasis added).

Plaintiffs also argue that the Court erred by disregarding Albers' deposition testimony that she relied on market data and other sources not

mentioned in her report to arrive at her conclusions. ECF No. 123-1 at 26 (citing ECF No. 60-4 at 29, 31–32, 35, 29–41); *id.* at 27. However, "Rule 26(a)(2) 'does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony.'" *Lyons v. Leatt Corp.*, 322 F.R.D. 327, 335 (N.D. Ind. 2017) (quoting *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008)). Thus, the Court rightfully did not consider novel supporting facts and data introduced in Albers' deposition in an apparent attempt to supplement her deficient export report. *See Ciomber*, 527 F.3d at 642 ("[The plaintiff's] assertion that [the expert's] deposition testimony cured his deficient report is meritless.").

Finally, Plaintiffs argue that the Court erred by finding the single W-2 insufficient to establish lost earning capacity, ignoring the fact that, as the Court noted in its order, Albers did not include this document in her lost earnings capacity analysis, instead listing it at the beginning of her report only as among the items she reviewed. ECF No. 123-1 at 24–25. At any rate, Plaintiffs contend that *Tate*, the case upon which the Court relied, is distinguishable on the basis that the court there found bank deposits to be insufficient evidence of earning capacity "because they . . . did not provide any evidence of how much [the plaintiff's] services were worth, his income, or how that money was allocated." *Id.* at 25 (citing *Tate*, 638 F. Supp. 2d at 912). However, Plaintiffs suffer from the same problems here. The evidence elicited at trial showed that Nomedas took some uncertain percentage of Teresko's earnings and that Teresko also had to pay Navickis and his crew some uncertain portion of his earnings. Panizich testified that there are simply too many unknowns with the W-2, with which the Court agrees.

Regardless, in its order on the Rule 702 motion, the Court found the single W-2 insufficient standing alone (assuming Albers even relied on it,

which it does not appear that she did), but it permitted Plaintiffs to try to bolster this evidence at trial. It did not prohibit Plaintiffs from introducing the W-2. Indeed, Plaintiffs' counsel did just that when they elicited testimony from Nomedas and Teresko regarding their earnings and read Panizich's deposition testimony as to lost earning capacity into the record, all in conjunction with the W-2. Thus, the Court stands by its order on the Rule 702 motion to exclude Albers' opinion and rejects Plaintiffs' instant arguments to the contrary.

### 3.2.6 The Jury's Damages Award

Plaintiffs challenge the jury's damages award as "shockingly low" and not rationally connected to the evidence. ECF No. 123-1 at 28 (citing *Slane v. Mariah Boats, Inc.*, 164 F.3d 1065, 1067 (7th Cir. 1999)). During closing arguments, Plaintiffs asked for between $381,732 and $462,000 for future medical care and expenses, based on Albers' life care plan, which accounted for the eventual ankle surgery that Dr. Schmeling opined Teresko would need. ECF No. 138 at 82–83. The jury awarded $200,000. ECF No. 122 at 4. Plaintiffs asked for between $936,000 and $1.566 million for past loss of earning capacity. ECF No. 138 at 85–86. The jury awarded $80,000. ECF No. 122 at 4. For future loss of earning capacity, Plaintiffs asked for between $3.6 million and $6 million for the remaining 30 years of Teresko's working life. ECF No. 138 at 86–87. The jury awarded $0. ECF No. 122 at 4. For past pain, suffering, disability, and disfigurement, Plaintiffs asked for $6.5 million. ECF No. 138 at 104. The jury awarded $50,000. ECF No. 122 at 4. Finally, for future pain, suffering, disability, and disfigurement, Plaintiffs asked for between $10 million and $15 million. ECF No. 138 at 107. The jury awarded $50,000. ECF No. 122 at 4.

Plaintiffs now contend that, at the very least, the jury should have accepted Panizich's testimony that Teresko's past lost earning capacity was $57,470 annually over the 101 weeks that he was unemployed. *Id.* at 29.[16] The jury should also have accepted, according to Plaintiffs, the purportedly undisputed evidence showing that in the two and a half years leading up to trial, Teresko could not have worked as a climber, had numerous restrictions, and could only work part-time with a four-hour restriction. *Id.* Thus, at a minimum, Plaintiffs assert that Teresko's earnings should have been extrapolated using Panizich's figure and then cut in half due to the four-hour restriction to calculate both past and future loss of earnings. *Id.* As to past and future pain and suffering, they argue that the testimony about Teresko's pain, surgery, permanent restrictions, future surgeries, and psychological conditions is undisputed and compels higher damages amounts in these categories. *Id.* at 30–31.

As the Court stated to the parties outside the presence of the jury,

This is one of those cases, in all honesty, the sky is literally the limit, both in terms of the jury coming back with zero because of no liability or liability and $200,000 in damages plus medical, or $20 million. I appreciate that's what this case boils down to. It's either going to be decided in one of three bases; no liability, liability and relatively speaking nominal damages, or the sky is the limit.

ECF No. 135 at 7–8. The second option is what transpired. None of Plaintiffs' arguments is persuasive, and the Court finds the jury's damages awards rationally supported by the evidence. *See Gower v. Vercler*, 377 F.3d 661, 666 (7th Cir. 2004) (after the jury returns its verdict, "[the] Court is

---

[16]Plaintiffs' briefing uses the figure $57,540. ECF No. 123-1 at 29. The figure elicited at trial was $57,470. ECF No. 136 at 62.

Page 84 of 95

limited to deciding only whether the evidence presented at trial, with all the reasonable inferences drawn [therefrom], 'is sufficient to support the verdict when viewed in the light most favorable to the [prevailing party]'") (quoting *Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1043 (7th Cir. 2000)).

The jury heard that Dr. Schmeling released Teresko to seated work with breaks as of September 2020, approximately eight months after the fall and around the time that Teresko first began walking again. As of December 2020, Dr. Schmeling opined that Teresko was progressing. As of August 2021, Teresko's treating psychologist noted that his PTSD symptoms had largely abated and that as he recovered and began working, his prognosis was good. Dr. Sasor testified that while Teresko is restricted from climbing work, he can work with restrictions as to his left arm. Dr. Grunert, who the jury heard only examined Teresko once via Zoom, opined that Teresko could work four-hour days, though not consistently. Teresko testified regarding performing community service work cleaning at his church and washing dishes at animal shelters, though he was ultimately let off from these tasks given his doctors' restrictions. Navickis testified that when he saw Teresko in 2023, he thought Teresko was "basically regular old Rytis" and doing "amazing."

The jury heard that Teresko was only taking home a few thousand dollars while running Universal Tower in the years leading up to the fall, that his income with Nomad was uncertain because it depended on how much Teresko paid Nomedas or his crew out of what he earned, that work with Nomad could dry up at any time, and that it was unclear how much work there would be in 2020. The jury further heard about Teresko's duties with Universal Tower, which involved not only climbing work, but also

mappings and logistics, including attaining contracts and personnel decisions. It heard about Teresko's work in visual communications and his studies in both the areas of C.A.D. and graphics communications, as well as the fact that he speaks four languages. It also heard that he has a bachelor's degree in business management and administration.

A reasonable jury could certainly have inferred and determined that, as of September 2020 at the earliest, Teresko could have found and become gainfully employed in a seated job based on these skills. The jury was free to weigh these witnesses against Albers, who claimed that Teresko had no transferable skills and was permanently out of the labor market, and make a credibility determination accordingly, particularly since Albers admitted that she was unaware of Teresko's background studies in graphics communications. The same is true with respect to weighing the restrictions suggested by Dr. Schmeling, Dr. Sasor, and Teresko's treating psychologist as compared to Dr. Grunert, who only saw Teresko once via Zoom.[17] A past loss of earning capacity award of $80,000 is rationally supported by this evidence considering Teresko's actual earnings before the fall and the uncertainty of what he would have made with Nomad. A future loss of earning capacity award of $0 is also rationally supported by this evidence, particularly given that the jury heard that Teresko has participated in races—albeit with pain—since the fall.

---

[17]In fact, the jury may have wondered, like the Court does, why Plaintiffs' counsel hired and called Dr. Grunert and chose not to call Teresko's treating psychologist, from whom the jury only saw written records. A reasonable jury may have drawn negative inferences regarding Teresko's mental state based on these facts.

The jury also heard that Teresko does not remember his fall, which may have reasonably limited his past pain and suffering, and that he declined a procedure that could have reduced his scarring, which may have reasonably limited an award for disfigurement. The jury heard, again, that he has participated in multiple races since his fall, which may have reasonably limited his future pain and suffering.

With respect to these categories, the jury also heard about Teresko's falls and car accident after the February 8, 2020 fall, which it was free to (1) attribute to Teresko's vertigo and symptoms derived from the accident or (2) view as isolated circumstances having nothing to do with the accident but which further contributed to Teresko's physical conditions. The jury also heard about Teresko's felony conviction (which Albers admitted could have affected his employment prospects) and his struggles before the fall with alcohol abuse, as well as his struggles after the fall with opioid, alcohol, and cocaine abuse. It further heard quite a bit of testimony about the decline of Teresko's marriage to Ms. Teresko. As to Plaintiffs' marriage, the jury was properly instructed that "[i]n considering any past or future damages to award . . . Teresko, you may not award any amount based on or resulting from . . .Teresko and [Ms.] Teresko's divorce." ECF No. 120 at 22; *see also* ECF No. 137 at 42 (parties' mutual agreement to include this instruction).

The jury may have reasonably determined from this evidence that Teresko's mental and emotional suffering, and exacerbation of his physical conditions, is due to circumstances having nothing to do with the fall, his own actions, or the divorce, the latter of which it was instructed not to consider. Against all this evidence, the jury's past and future pain, suffering, disability, and disfigurement awards of $50,000 respectively were

Page 87 of 95

rational. The jury appropriately applied its broad discretion on the matter. *See Rupp v. Travelers Indem. Co.*, 115 N.W.2d 612, 617 (Wis. 1962) ("It was . . . within the province of the jury to evaluate how much of the medical expenses, pain and suffering, loss of wages, and disability existed and was caused by the accident. The case presented typical jury questions."). The Court sees no reason to disturb the jury's damages award and accordingly rejects Plaintiff's arguments. Indeed, although Plaintiffs suggest that the jury's verdict was shockingly low, in the Court's view, it was Plaintiffs' *own* suggestions in closing arguments which, against the weight of the evidence, were shockingly high.

In sum, the evidence elicited at trial did not support Plaintiffs' requested jury instructions, 3M did not stray from its speed theory at trial, and the evidence surrounding the cause of Teresko's fall and his contributory negligence was neither speculative, irrelevant, nor insufficient against the weight of the evidence. The Court properly excluded Albers' lost earnings opinions, and the jury's damages award was rationally supported by the evidence. For all these reasons, Plaintiffs' Rule 59 motion for a new trial is denied in its entirety.

**4.   3M'S RULE 50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

### 4.1   Legal Standard

Rule 50(a) allows a party to move for judgment as a matter of law on a particular claim when (1) "a party has been fully heard on [the claim] during a jury trial," and (2) "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non–moving] party on that [claim.]" Fed. R. Civ. P. 50(a)(1). Rule 50(b) is simply a method

to renew a Rule 50(a) motion. Fed. R. Civ. P. 50(b). The Seventh Circuit instructs that

> [i]n deciding a Rule 50 motion, the court construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence. The court does not make credibility determinations or weigh the evidence. Although the court reviews the entire record, the court must disregard all evidence favorable to the moving party that the jury [was] not required to believe.

*Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012) (citations and quotations omitted).

The Court "reverse[s] the verdict only if no rational jury could have found for the prevailing party." *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 835 (7th Cir. 2013) (citing *Bogan v. City of Chicago*, 644 F.3d 563, 572 (7th Cir. 2011)). Put another way, "a motion for a judgment as a matter of law can be granted only if the court—after viewing the evidence in the light most favorable to the non–movant—believes that the evidence 'supports but one conclusion—the conclusion not drawn by the jury.'" *Mejia*, 650 F.3d at 634 (quoting *Ryl–Kuchar v. Care Ctrs., Inc.*, 565 F.3d 1027, 1030 (7th Cir. 2009)).

### 4.2    Analysis

3M primarily moves for a take-nothing judgment because the jury found Teresko 80% at fault for the accident, which bars his recovery and Ms. Teresko's derivative loss of consortium claim. ECF No. 125 at 1–2 (citing ECF No. 122 at 3, Wis. Stat. § 895.045, and *Blunt v. Medtronic, Inc.*, 760 N.W.2d 396, ¶ 19 n.12 (Wis. 2009)). However, "in an abundance of caution," 3M also "renews some of the sufficiency-of-the-evidence challenges it raised in its Rule 50(a) motion." *Id.* at 2 (citing ECF No. 109). It argues that the "evidence is legally insufficient to support an affirmative finding on

Page 89 of 95

reasonable alternative design [and] design defect" as well as on causation as to both the strict liability and negligence claims, all of which was addressed and answered affirmatively by the jury in Question Nos. 1 through 4 of the verdict form. *Id.* at 2, 7–11; ECF No. 122 at 1–2. The Court disagrees.

To establish design defect strict liability under Wisconsin law, a plaintiff must prove

> (a) That the product is defective because it . . . is defective in design . . . . A product is defective in design if the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe. . . .
>
> (b) That the defective condition rendered the product unreasonably dangerous to persons or property.
>
> (c) That the defective condition existed at the time the product left the control of the manufacturer.
>
> (d) That the product reached the user or consumer without substantial change in the condition in which it was sold.
>
> (e) That the defective condition was a cause of the claimant's damages.

Wis. Stat. § 895.047(1). For Plaintiffs' negligence claim, the elements are familiar and require the plaintiff to prove "(1) [a] duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury." *Morden v. Cont'l AG*, 611 N.W.2d 659, ¶ 45 (Wis. 2000) (quoting *Rockweit v. Senecal*, 541 N.W.2d 742, 747 (Wis. 1995)). With respect to duty in the negligent design context, the factfinder "determine[s] whether there [i]s any credible evidence or inference therefrom to support the finding that

[the defendant] knew or, in the exercise of ordinary care, should have known, that the [product] posed a foreseeable risk of injury." *Id.* ¶ 48.

3M posits, and the Court agrees as set forth *supra*, that a reasonable jury could not conclude—against the weight of the evidence—that Dr. Russell's modified device and testing adequately show "what lateral-load forces a human is likely or even capable of exerting on an X3 when grabbing it during a fall." ECF No. 125 at 5. Dr. Russell admittedly never tested his modified device in the field, on a tower, or in cold weather, and he never tested it with a lateral load application after a fall began. He also never tested it while wearing gloves or bulky clothing like Teresko was wearing. The Court well agrees with 3M that the evidence at trial, including Dr. Russell's testing, is insufficient for a reasonable juror to find that Teresko panic grabbed the X3 in a manner sufficient to negate both braking mechanisms after the fall began. The evidence instead more strongly suggests to a reasonable juror that, because such a panic grab cannot occur in a way that is *not* a product misuse—i.e., grabbing the X3 before the fall begins—and because there is only one way of which 3M is aware to defeat both braking mechanisms, which is lateral load to the handle, Teresko must have misused the device.

However, there is ample evidence in the record for a reasonable jury to conclude that Dr. Russell designed out the foreseeable misuse of grabbing the X3 before a fall commences. Miller testified that Dr. Russell's modification designed out this misuse, and Small testified that Dr. Russell's modified design would probably pass ANSI standards. 3M was certainly aware of the misuse because it warned against it. While it was able to design out the panic grab problem with the X1 in the X2 and X3 by adding the inertial brake and creating a device that locks too quickly to be panic

grabbed in a way that defeats both braking mechanisms, it has not designed out the misuse of touching the device before a fall begins. Instead, it warns against it.

Although a reasonable jury could find that the climber—here, Teresko—is more at fault for grabbing the device before the fall began, which is contrary to the user instructions and warning label, a reasonable jury could also find that if such a misuse *could* be designed out, it should be. 3M repeats in its instant briefing the weaknesses and gaps that it elicited at trial from Dr. Russell's testing. ECF No. 125 at 3–4 (arguing that Dr. Russell only tested his device with 28–29 pounds of lateral load and does not know if there is an amount of lateral load that could defeat his design). But the jury heard those same weaknesses and gaps and determined nonetheless that the X3 as designed is defective and unreasonably dangerous, and that 3M was negligent, both of which were causal of Teresko's injuries. ECF No. 122 at 1–2. Indeed, the jury heard that 3M itself has never run a test to try to quantify lateral load on an X3 or X2, from which it could determine that at least 3M's attack on the amount of lateral load that Dr. Russell applied in his testing was illusionary.[18] The crux of 3M's instant arguments is that Dr. Russell's modified device was not tested with

---

[18]Other elements of Dr. Russell's testing are different. As discussed at length throughout this Order, 3M tried to test lateral load after a fall begins but was unable to do so because it determined that the necessary hand maneuver is impossible given the speed at which the device locks. Dr. Russell did not attempt such a test, nor did he analyze reflex or perception reaction time. Further, Miller testified extensively regarding 3M's efforts to replicate field conditions with its testing, which Dr. Russell did not do. These points, however, go towards the fact that Dr. Russell's testing *does not* model a panic grab scenario, while, as noted in this Section, it *does* model a misuse scenario of intentionally grabbing the device before a fall.

panic grab during a fall or in a climbing scenario, ECF No. 142 at 2–3, or in the field, *id.* at 4, but it nonetheless *was* tested stationary and with a lateral force device, which simulates the misuse scenario of intentionally grabbing the X3 before a fall. As noted, the jury heard evidence that Teresko was stationary on the tower right before he fell.

"To prove the existence of a reasonable alternative design, 'a plaintiff need not produce an actual prototype of a reasonable design alternative, nor does a plaintiff have to show that the alternative design was ever adopted by a manufacturer or considered for commercial use.'" *Vanderventer v. Hyundai Motor Am.*, 983 N.W.2d 1, ¶ 96 (Wis. Ct. App. 2022) (citing *Murphy v. Columbus McKinnon Corp.*, 963 N.W.2d 837, ¶ 52 (Wis. Ct. App. 2021)), *review denied*, 999 N.W.2d 638 (Wis. 2022). "Instead a plaintiff may rely on credible expert testimony that the alternative design could have been practically adopted as of the time of sale." *Id.* (quoting *Murphy*, 963 N.W.2d, ¶ 52). The jury was entitled to credit Dr. Russell's testimony that his modified device could be practically adopted against the weaknesses in his testing elicited by 3M (especially given that 3M itself has not run a test to quantify lateral load) in arriving at its determination.

For similar reasons, 3M's argument that "Plaintiffs have failed to elicit any evidentiary facts from which the jury could conclude that the X3 caused . . . Teresko's fall" fails. ECF No. 125 at 10. Miller testified that the only way that he knows for the X3 to fail is lateral load to the handle. The jury did not need to "impermissibly guess" after hearing this testimony how the X3 failed. *Id.* at 11. Reconciling the jury's verdict against this evidence, the only conclusion is that the jury reasonably found that Teresko misused the X3 by grabbing it before he fell, but that 3M could have found a way to design that misuse out like Dr. Russell did. Because Teresko was

Page 93 of 95

warned not to grab the X3 before he fell, however, and because a reasonable jury could have found him contributorily negligent for myriad additional reasons discussed in this Order, he was reasonably found to be more at fault. Thus, the Court denies 3M's Rule 50(b) motion challenging the sufficiency of the evidence as to Question Nos. 1 through 4 of the verdict form.

However, 3M is correct that it is entitled under Wis. Stat. § 895.045 to a take-nothing judgment. The Court will grant that portion of the motion, and judgment will be entered accordingly.

**5.      CONCLUSION**

Regrettably, Plaintiffs' apparent strategic decision to keep 3M in the dark by not alerting it of Teresko's fall until this lawsuit was filed, as well as the lack of recovery of all equipment together with Plaintiffs' tardy investigation, has made it impossible for the fall to be fully reconstructed.

From the evidence that *was* elicited at trial, a reasonable jury found that the X3 failed to arrest Teresko's fall due to a lateral load to the handle that must have been applied *before* Teresko's fall began. This is a foreseeable misuse of the device that was known to Teresko, but one that Plaintiffs' expert was able to design out. Nonetheless, because a reasonable jury could find that the evidence compels the conclusion that Teresko misused the device, the jury reasonably found him 80% at fault, as compared to 3M's 20%. The jury's verdict was amply supported by the evidence, and the trial was not conducted in a manner that was fundamentally unfair to Plaintiffs. Accordingly, Plaintiffs' Rule 59 motion—which the Court again views as little more than sour grapes—will be denied. 3M's Rule 50(b) motion will be denied, but its request for entry of a take-nothing judgment will be granted.

Accordingly,

**IT IS ORDERED** that Defendant The 3M Company's motion to exclude Plaintiffs Rytis Teresko and Edita Teresko's shake-test demonstration, ECF No. 103, be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Plaintiffs Rytis Teresko and Edita Teresko's Federal Rule of Civil Procedure 59 motion for a new trial, ECF No. 123, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendant The 3M Company's Federal Rule of Civil Procedure 50(b) renewed motion for judgment as a matter of law, ECF No. 124, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendant The 3M Company's motion for entry of a take-nothing judgment in its favor in accordance with Wis. Stat. § 895.045, ECF No. 124, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiffs Rytis Teresko and Edita Teresko shall have and recover nothing in accordance with Wis. Stat. § 895.045; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is directed to enter a take-nothing judgment in favor of Defendant The 3M Company accordingly.

Dated at Milwaukee, Wisconsin, this 4th day of October, 2024.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge